[No. S010528. Mar. 7, 1996.]

In re KELVIN SHELBY MALONE on Habeas Corpus.

936

COUNSEL

Fern M. Laethem, State Public Defender, and Stephen Matchett, under appointments by the Supreme Court, Edward H. Schulman, Chief Assistant State Public Defender, William Blum, Deputy State Public Defender, and Nancy Gaynor for Petitioner.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Harley D. Mayfield and Gary W. Schons, Assistant Attorneys General, Holly Wilkins, Pat Zaharopoulos, William D. Wood, Jay M. Bloom and Garrett Beaumont, Deputy Attorneys General, for Respondent.

OPINION

**WERDEGAR, J.**—Kelvin Shelby Malone is confined at San Quentin State Prison pursuant to a judgment of death rendered in the San Bernardino

County Superior Court. In that proceeding, he was convicted of the first degree murder (Pen. Code, §§ 187, 189)[1] of Myrtle Benham, with special circumstances of previous conviction of murder (§ 190.2, subd. (a)(2)) and murder during the course of robbery and kidnapping (§ 190.2, subd. (a)(17)(i), (ii)). The jury fixed the penalty at death. We affirmed the judgment on automatic appeal. (*People* v. *Malone* (1988) 47 Cal.3d 1 [252 Cal.Rptr. 525, 762 P.2d 1249].)

On June 5, 1989, Malone filed the present petition for writ of habeas corpus. This court issued an order to show cause and, after receiving respondent's return, appointed a referee to hear evidence and make factual findings. The referee has now filed his report and the parties have filed exceptions to the report and briefs on the merits of the petition.

Petitioner's chief claim for relief is the allegedly false testimony of a prosecution witness, Charles Laughlin, who testified he received accounts of the charged crime and other crimes from petitioner while they were both confined in the Riverside and San Bernardino County jails. In answer to one of the factual questions posed by this court, the referee found Laughlin "probably lied when he testified at the *Malone* trial that he received his information from Kelvin Malone." We conclude the referee's findings, including this one, are supported by substantial evidence and should be accepted by this court.

In many cases testimony such as Laughlin gave—i.e., testimony relating the petitioner's confessions to the charged murder and two other murders—would necessarily be considered material and probative on the issues of both guilt and penalty. Several notable and unusual aspects of this case lead us to the opposite conclusion here. On the issue of guilt, petitioner himself testified he and his accomplice robbed and kidnapped Benham, taking her to the place where her dead body was later found. Overwhelming evidence established she was killed in the course of that robbery and kidnapping, thus making petitioner liable for first degree murder in her death irrespective of whether he personally killed her. As to penalty, the evidence independent of Laughlin's testimony clearly established that petitioner initiated and fully participated in a cross-country crime spree that included four robbery murders in the space of five days. In light of this independent evidence, and that of petitioner's other violent crimes, we are confident the result of the penalty proceeding would not have been different in the absence of Laughlin's testimony.

Consequently, we conclude that petitioner is not entitled to vacation of the judgment as a whole because the false evidence provided by Laughlin,

---

[1] All further unspecified statutory references are to the Penal Code.

viewed in context of the entire trial evidence, was not substantially material to or probative on either guilt of the charged first degree murder or the choice of punishment. (§ 1473, subd. (b)(1); *In re Sassounian* (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527].) Because the false evidence was, however, substantially material to and probative on the truth of the felony-murder special-circumstance allegations, we will order the findings on those allegations vacated.

## I. FACTUAL AND PROCEDURAL BACKGROUND

*The Evidence at Trial*

The evidence presented at petitioner's trial will be reviewed here only briefly; a fuller description appears in our opinion on the appeal (*People* v. *Malone, supra,* 47 Cal.3d at pp. 12-16), and additional facts, when pertinent, are stated in the discussion.

On March 20, 1981, Myrtle Benham was kidnapped from her workplace, a gas station in Baker, and was beaten to death in an abandoned shack near Daggett, both in San Bernardino County. Her body was found lying facedown, nude below the waist. The cause of death was blunt force injury to the head.

Petitioner, testifying in his own behalf, admitted he and Michael Crenshaw robbed the gas station where Benham worked, took Benham from the station at gunpoint and drove her to the shack. According to petitioner, Crenshaw took Benham into the shack while petitioner, who thought Crenshaw was merely going to tie Benham up and leave her, waited in the car. When Crenshaw returned, he said nothing about beating, raping or killing Benham. Petitioner presented evidence of a polygraph examination in which the examiner found he answered truthfully that he did not himself kill Benham, although he lied when he denied having been at the shack where she was killed.

Crenshaw testified at petitioner's preliminary examination, and that prior testimony was admitted at trial when Crenshaw asserted his Fifth Amendment privilege. Crenshaw too admitted robbing the gas station with petitioner and taking Benham to the shack. According to Crenshaw, however, it was petitioner who took her inside, saying he was going to have sex with her. After some time Crenshaw went to the door of the shack, where he saw petitioner lying on top of Benham, who was facedown and nude below the waist. Petitioner then beat her on the head with a pipe, and he and Crenshaw left.

The only other direct evidence petitioner was the actual killer of Benham came from Charles Laughlin, who testified petitioner had described his crimes, including the murder of Benham, to Laughlin in jail. According to Laughlin, petitioner said he beat Benham to death while Crenshaw held her. Laughlin testified petitioner said he beat Benham to death with a gun. Petitioner, in contrast, testified he had never discussed his murder cases with Laughlin and claimed Laughlin must have obtained his information by going through petitioner's papers when they were housed together in San Bernardino County jail.

Petitioner previously had been convicted of the first degree murder of Minnie Ola White, whose body was found in the trunk of her car near Blythe (Riverside County) on March 21, 1981. In his testimony at the Benham murder trial, petitioner denied any involvement in or knowledge of White's killing. Evidence was presented that he was apprehended (with Crenshaw) on March 24, in possession of White's rings and credit cards, and with a piece of skin on his trousers consistent in blood type with White's. Petitioner admitted owning the pistol with which White was killed, but testified he had given it to Crenshaw to use before the White killing. According to Laughlin's guilt phase testimony, petitioner said he and Crenshaw together forced White into the trunk of her car, where petitioner shot her in the face. The two then took her money and valuables.

At trial, the prosecution presented evidence of a third jointly committed murder, that of Jim Rankin. Rankin disappeared from the parking lot of a Kansas City, Missouri, restaurant on March 18, 1981. At the time of the Benham murder, petitioner and Crenshaw were driving Rankin's car, which they later burned, and when apprehended they had Rankin's credit cards and other property. Petitioner, who had escaped from the Monterey County jail on March 11 and gone to St. Louis to meet Crenshaw, testified he and Crenshaw stole Rankin's car in Kansas City after Rankin left his keys in the car and drove away with a woman in another car.

At the guilt phase trial, Laughlin testified petitioner told him petitioner and Crenshaw had kidnapped a man in Kansas City, putting him in the trunk of his car, which they then stole and drove to California. In the penalty phase, Laughlin added that petitioner said he put Rankin in the trunk, then later let him out and made him plead for his life before shooting him.

At the penalty phase, the prosecution presented evidence petitioner killed a fourth person during this same period, a St. Louis taxi driver named William Parr. Parr had been dispatched to a building near the bus station (where petitioner had arrived from California) and was shot to death near

Crenshaw's home. The bullet came from one of petitioner's pistols. In addition, the prosecution presented evidence of other violent conduct by petitioner, including aiding an in-prison forcible sodomy.

The defense, in the penalty phase, produced several witnesses to petitioner's difficult childhood, learning and social problems, and brain damage. The defense also called another San Bernardino County jail inmate, Terry Caylor, to impeach Laughlin. Caylor testified Laughlin said he would not have to stand trial in his own pending case because he was going to testify against petitioner. Caylor also saw Laughlin and Crenshaw talking together, and testified Laughlin said he had a deal with, and could get information from, Crenshaw.

*The Habeas Corpus Proceedings*

This court affirmed petitioner's convictions and death sentence on appeal in 1988. On June 1, 1989, petitioner's attorneys and investigator met with Laughlin. According to their subsequent declarations and testimony, Laughlin revealed at this meeting that he had not received any information about the crimes from petitioner. Laughlin signed a declaration revealing implied promises of lenient treatment, which the prosecution had not disclosed at trial, but refused to sign a declaration recanting his trial testimony as to petitioner's purported admissions. Laughlin explained he would not sign anything that would subject him to prosecution for perjury.

Laughlin's foregoing statements, together with information a juror, psychologist Dianne Irwin, may have misconducted herself during deliberations by discussing her own professional knowledge of polygraph testing, provided the basis for the petition for writ of habeas corpus, filed June 5, 1989. In opposition, respondent presented an additional declaration from Laughlin, dated June 27, 1989, denying he had fabricated any evidence against petitioner or had been promised any consideration for his testimony.

On August 15, 1990, we issued an order to show cause on the juror misconduct claims and the following claims regarding Laughlin's testimony: "the prosecution's failure to disclose to the defense that Charles Laughlin was impliedly promised consideration for his testimony; and . . . Charles Laughlin's allegedly untruthful testimony concerning the facts of the case and the consideration promised him for his testimony."

On April 1, 1992, we appointed the Honorable Kenneth G. Ziebarth, Jr., retired judge of the San Bernardino County Superior Court, to take evidence and make findings on six factual questions:

1. What did Juror Dianne Irwin tell her fellow jurors during deliberations about (a) her knowledge of polygraph examinations, and (b) her views on the reliability of such examinations?

2. Did Dianne Irwin tell fellow jurors her views were based on her research?

3. Did Charles Laughlin believe that the government had impliedly promised him "consideration" in exchange for his testimony in the Malone case?

4. Did the government impliedly promise Charles Laughlin consideration for his testimony in the Malone case?

5. Did Charles Laughlin have the opportunity to fabricate his testimony?

6. Did Charles Laughlin testify untruthfully when he said he received his information about the case from Kelvin Malone?

The parties litigated the above questions vigorously. After completion of discovery, an evidentiary hearing was held in June and July of 1994. The hearing was not limited to direct evidence as to the truthfulness of Laughlin's trial testimony, but included extensive circumstantial evidence on Laughlin's informing activities before, during and after petitioner's trial, his character for veracity or the opposite, and the circumstances surrounding the dismissal of two pending felony charges against Laughlin at the time of his testimony against petitioner.

After ruling on evidentiary objections and receiving written and oral closing arguments, the referee issued a proposed report and, on May 17, 1995, filed his final report with this court. In brief summary, the referee found:

Questions 1 and 2: Irwin told fellow jurors her professional reading and course work made her doubt the accuracy rates claimed by the polygraph examiners, and the key question to petitioner as to whether he killed Benham was worded in a manner that made it nonprobative.

Questions 3 and 4: Laughlin did believe he had been impliedly promised lenient treatment in exchange for his testimony; at least one government agent, San Bernardino Sheriff's Sergeant Bill Arthur, did make such implied promises.

Question 5: Laughlin had the opportunity to obtain information from sources other than petitioner, from which he could have fabricated his trial testimony.

Question 6: Laughlin testified falsely that petitioner had confessed to him.

For reasons given in the next section, we accept all the referee's factual findings. In the final section of the discussion, we consider whether the findings warrant relief in the form of reversal of either the murder conviction or the death sentence, ultimately concluding they do not.

## II. REVIEW OF THE REFEREE'S FINDINGS

■ The referee's findings are not binding on us, but are entitled to great weight when supported by substantial evidence. (*In re Ross* (1995) 10 Cal.4th 184, 201 [40 Cal.Rptr.2d 544, 892 P.2d 1287]; *In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435].) Deference to the referee is called for on factual questions, especially those requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying. (*In re Ross, supra,* 10 Cal.4th at p. 201; *In re Jackson* (1992) 3 Cal.4th 578, 585 [11 Cal.Rptr.2d 531, 835 P.2d 371].) Respondent impliedly argues such deference is not due here because the referee based his findings on questions 3 through 6 on "his own interpretation of the documentary evidence" rather than the live witnesses' demeanor and manner of testifying. Our own review of the record and the referee's report, however, does not support this assertion. The referee heard live testimony from numerous witnesses, including Laughlin, one of petitioner's appellate attorneys, law enforcement officers involved in investigating petitioner's case, the prosecutors and defense attorney involved in Laughlin's pending felony charges at the time he agreed to testify against petitioner, and witnesses to jailhouse conditions at the times Laughlin claimed to have conversed with petitioner about petitioner's crimes. In reaching his findings the referee necessarily compared and weighed this live testimony together with the written exhibits. We have no reason to doubt the witnesses' demeanor and manner of testifying played a role in the referee's resolution of many of the questions posed.

### Evidentiary Objections

At the close of the evidentiary hearing, respondent made or renewed several objections to evidence introduced by petitioner, which objections the referee overruled. Before assessing the evidentiary support for the referee's findings, we must determine whether respondent's objections should have been sustained.

Respondent's broadest objection was to any evidence of Laughlin's informing activities in other cases and, in particular, to evidence Laughlin

gave untruthful information on other occasions. Respondent argues such evidence was irrelevant and inadmissible under Evidence Code sections 787, 1101 and 352.[2] We disagree. The disputed evidence, as will be seen below, tended to show Laughlin had a consistent practice of collecting incriminating information regarding his fellow jail residents and offering it to law enforcement officials with the hope and expectation of receiving beneficial treatment in his own pending cases. In some cases the information offered was, by Laughlin's later admission, fabricated; in others it was demonstrably false. Such evidence was relevant to show a plan or scheme by Laughlin common to the other cases and, petitioner alleges, this case. (*People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) It was therefore not made inadmissible by Evidence Code section 787 or 1101. Nor is there anything to suggest a danger the referee, a retired trial judge, would be confused, misled or distracted (Evid. Code, § 352) by the evidence.

To the extent respondent's objections included evidence of other specific falsehoods by Laughlin, unrelated to the existence of such a common plan, we need not determine if they were well taken; the referee did not rely on evidence of any such isolated falsehoods, but cited instead *reputation* and *opinion* evidence of Laughlin's untruthfulness.

Assertedly inadmissible opinion evidence as to the reasons for the outcome of Laughlin's 1984 parole revocation hearing, the meaning of a statement Sheriff's Sergeant Arthur made to Laughlin, the results of a 1986 polygraph test Laughlin took, and whether Laughlin was a pathological liar, did not form the basis for any of the referee's findings and will not be relied upon here. Respondent's hearsay objection appears well taken as to testimony by John Laughlin, Charles Laughlin's father, recounting the statement of an unidentified prison employee concerning the reason for Laughlin's early release; we will not rely upon the evidence. Other hearsay objections to portions of some of petitioner's exhibits are not explained or specifically briefed; in any event, none of the cited evidence appears to have formed the basis for any of the referee's findings.

*Questions 1 and 2: Juror Irwin's Statements During Deliberations*

Juror Dianne Irwin, a psychologist, was asked by other jurors during deliberations what she thought about polygraph examinations. On the basis

---

[2]Respondent also argues this court "made it clear it was not interested in investigating Charles Laughlin's credibility beyond the *Malone* case" when we (a) remarked in our opinion on appeal that Laughlin's credibility had been significantly impeached at trial (*People* v. *Malone, supra,* 47 Cal.3d at pp. 33-34), and (b) when we summarily denied a supplemental petition seeking to include in the scope of the reference an allegation trial counsel should have impeached Laughlin more thoroughly. Neither action, however, suggests an intent to restrict the evidence admissible at the reference hearing on the factual questions we requested the referee determine.

of her declarations and testimony at the evidentiary hearing, the referee found she had told her fellow jurors the following: that she was not an expert on polygraphs, but had read and discussed professional articles on the subject in the course of her studies in psychology; that while polygraph examiners claim an accuracy rate of 80 to 90 percent, Irwin was skeptical of that claim because independent researchers had found accuracy rates of only 50 to 60 percent; and that a key question petitioner answered truthfully, according to the examiner—whether he had killed, as Irwin remembered it being phrased, "the woman in Baker"—was not probative on his guilt because the woman was not killed in Baker, but some distance away near Daggett. Irwin told the other jurors these beliefs were based on her readings rather than on her own experimental research.

Neither party takes exception to these findings, and they are supported by Irwin's uncontradicted testimony. We therefore accept them as true.

*Questions 3 and 4: Implied Promises of Consideration for Laughlin's Testimony*

Based on the "weight of the credible evidence and the reasonable inferences that can be drawn therefrom," the referee found that Laughlin believed the government had impliedly promised him some form of "consideration" for his testimony in the San Bernardino prosecution of petitioner, and that San Bernardino Sheriff's Sergeant Bill Arthur did make such implied promises. Respondent takes exception to these findings. We will review the evidence, beginning with the statements of Laughlin and others as to whether any implied promises were made.

*Direct Evidence of Implied Promises*

At petitioner's trial, Laughlin testified he had received no promises in exchange for his testimony; he claimed he was moved to inform on petitioner because of the violence of the crimes to which petitioner confessed.

In his June 1, 1989, declaration, however, Laughlin indicated he had sought and expected some form of leniency: "Because of my custodial status, including the then pending charges of escape, robbery, attempted murder and assault with a deadly weapon, I wanted to obtain 'consideration' from the prosecuting authorities so as to avoid spending further time in prison. [¶] To that end, I spoke to one of the investigating officers on the *Malone* case [Bill Arthur], whom I had reason to trust from previous contacts, to see if I could obtain that 'consideration' if I were to provide important testimony for the prosecution in the *Malone* case. [¶] When I

asked investigating officers what I could expect for my testimony in the *Malone* case, I was told they could make no promises, 'that I would have to give before I could get.' After I continued to pry as to what I could expect for my cooperation, I was told: 'Don't worry, you can trust me, and that 'you would get the things that you're looking for after you testified.' [¶] Being familiar with 'the system', I understood these comments to mean that law enforcement would provide the 'consideration' I requested once I had testified for the prosecution in the *Malone* case."

In the June 27, 1989, declaration he supplied to respondent, Laughlin stated: "I was never promised anything to testify either by law enforcement or the prosecuting attorney. I do not know for a fact that anything was done about my pending cases as a result of my testimony. [¶] The only thing I was ever promised was a letter. I believe Sgt. Billy Arthur wrote a letter to Dennis Kottmeier, District Attorney, explaining my involvement in the Malone cases."

Sergeant Bill Arthur, homicide supervisor on the Benham murder, declared, "I never promised Charles Laughlin anything for his testimony against Kelvin Malone." Arthur died before the evidentiary hearing. Deputy John Clifford, also assigned to the Benham case, similarly declared he "never promised" Laughlin anything for his testimony. Clifford testified to the same effect at the evidentiary hearing, adding that he had not made any implied promises and knew of none made by Arthur.

Laughlin's June 27, 1989, declaration was prepared by Hans VanderVeen, an investigator for the San Bernardino County District Attorney, after a taped interview on June 22, 1989. In the course of that interview Laughlin made what the referee characterized as "some very candid comments."

Laughlin explained how, as a general practice, he explicitly tied his information to requests for benefits from law enforcement officials: "[U]ntil this date, even the only cooperation I've done since, from, from even this time, is that, hey I've got this, you can have it, but I want something. And from this time I've gone as far as to tell the officers I know when you come in, hey, I know you can't make no promises, or anything, but here's what I have. Yes, I'm willing to give it, yes, I'm willing to testify. Do you want it? . . . [¶] I know directly you cannot say anything. But in the end run, this is what I want. This is the picture I'm looking at that I want to come true. And I would always, every time that I felt, any time I felt insecure with it, I would bring it up."

In the spring of 1983, Laughlin was serving a prison sentence for grand theft and faced pending felony charges of escape from state prison and

robbery. He was informing in petitioner's case and others, including another capital murder prosecution, *People* v. *Roberts*. In the VanderVeen interview, he explained what benefits he sought with regard to his own pending cases from Sergeant Bill Arthur, whom he trusted, and what implicit assurances Arthur gave him: "[W]henever I felt down in the dumps or insecure, I'd always harp on Bill. And hey, this is what I want. You got to give me some assurance. And he would never come out and say, yeah. He would always tell me, don't worry. . . . [¶] And then I know that the escape went bye-bye. *I don't know in reference to whose case* or when exactly it happened. But I know, Bill. I believe Bill was bringing me back from Glen Helen one time . . . and I said, okay well one of them is gone, now what about the other one. *And he said again, don't worry. Remember what happened on the first one.*" (Italics added.)

Laughlin explained that he believed, but did not know, the dismissal of his escape and robbery charges was related to his cooperation in petitioner's case and others. "I believe, or I feel, but then again, it's only my feelings. I don't know for a fact, if that's why these things came about. . . . I told them that these were the charges, these were the issues. This is what I was involved with. They may, my request was help me. They may have helped me. Whether they did or not for a fact, I don't know. *I was always told, don't worry. So. I didn't.*" [¶] VanderVeen: "And who was the one, that again told you not to worry." [¶] Laughlin: "Bill." [¶] VanderVeen: "Bill who?" [¶] Laughlin: "Arthur." (Italics added.)

After his escape and robbery charges were dismissed, Laughlin sought help from Sergeant Arthur to get his current prison sentence reduced to reflect additional credits to which he felt he was entitled: "I told Bill what I wanted. He knew one of the investigating officers at Chino facility. They were good associates I guess. And I told him, hey, do what you can do. Get me out of prison. I want to be home with my family. I've given you two special circumstance murders. . . . And, uh, to my knowledge they made what contacts they could . . . . [but] [e]verybody, said no go. It was out of the original judge's jurisdiction and there was nothing that could be done."

As part of the evidentiary hearing, Laughlin's sworn testimony was taken April 28, 1993, in Oregon, where he was incarcerated. The referee and counsel for both parties were present. Laughlin testified that while providing information against petitioner he asked Sergeant Arthur for "several things,"

including help in getting his pending escape and robbery charges dismissed.[3] On the subject of whether Arthur had given him any implied assurances of help, petitioner's attorney asked: "Mr. Nacsin was reading to you some exchanges in that Vanderveen (*sic*) interview where you were talking about your conversations with Bill Arthur about what you wanted and he could not promise you anything directly, but he told you, 'Don't worry,' that kind of thing. Without characterizing those as express or implied promises, is that to the best of your recollection what actually happened?" Laughlin answered affirmatively.

### Evidence Laughlin Actually Received Lenient Treatment

As circumstantial evidence on the question of implied promises, the referee also considered the dismissals of Laughlin's escape and robbery charges. Although both dismissals were officially stated to be for insufficient evidence, and although the prosecutors involved denied any link to Laughlin's informing activities, the referee found "the circumstances surrounding those dismissals and their timing strongly suggests that there was some connection."

Laughlin escaped from the California Institution for Men in Chino on July 12, 1982. Five days later, he was apprehended in Placer County, following a high-speed chase in a car with stolen license plates. On his arrest, he gave false identification.

In August 1982 Laughlin was charged with felony escape. At an appearance in September 1982, he feigned deafness, delaying the proceedings for a week. The prosecutor noted in his file that Laughlin was "jacking the system" and "should get the book thrown at him." The municipal court found his claim of deafness false and made for purposes of delay, and, after a preliminary hearing, held him to answer on the charge.

In superior court, the case was assigned a new prosecutor, Clyde Boyd. On March 25, 1983, Boyd recommended the case be dismissed for insufficient evidence. Boyd's recommendation was approved the same day by the chief deputy district attorney. The case was dismissed on March 28.

Laughlin first talked to the police about petitioner on March 10, 1983, and first gave the police a detailed, recorded statement of his information against petitioner on March 22, 1983. He first testified at petitioner's trial on March

---

[3]Consistent with his statements to Investigator VanderVeen, Laughlin testified that, as a general practice when informing, "I always ask for something. . . . if you are going to give something, you ask for something in return, even if it's recognition."

30, 1983. Laughlin was also informing during this period in the Roberts murder case in San Bernardino County; he first testified at the Roberts preliminary hearing on March 2, 1983.

At the evidentiary hearing, prosecutor Boyd testified he recommended dismissal of the escape charge because he believed the testimony of the available witnesses from the prison would support a defense based on *People v. Lovercamp* (1974) 43 Cal.App.3d 823 [118 Cal.Rptr. 110, 69 A.L.R.3d 668],[4] and obtaining a conviction would therefore be difficult or impossible. Boyd testified he was initially skeptical of the *Lovercamp* claim, which he first heard from Laughlin's attorney. He then talked to the prison investigator on the case, a Mr. Murray. According to Boyd, Murray confirmed that the prison records documented threats against Laughlin's life because of his informing activities, and that a prison disciplinary board had accepted the defense and decided not to revoke Laughlin's credits because of the escape. In his subsequent written recommendation for dismissal, Boyd summarized what he had learned as follows: "Lovercamp defense should work this time because this defendant has become a professional snitch . . . . [¶] The defendant was found not guilty by the prison disciplinary board on this escape on a Lovercamp defense so apparently even they recognize its validity. We can't win this case so we might as well bite the bullet now."

Two aspects of the case led the referee to question Boyd's explanation of the dismissal recommendation. First, that Laughlin was completely incapable of satisfying the immediate surrender element of the *Lovercamp* defense was undisputed. Far from surrendering as soon as he had "attained a position of safety from the immediate threat" (*People v. Lovercamp, supra,* 43 Cal.App.3d at p. 832), Laughlin was apprehended by force five days later and hundreds of miles away.[5]

Second, at the time of Boyd's discussion with Murray and his dismissal recommendation no prison disciplinary hearing or determination had in fact taken place. Action on the disciplinary charges against Laughlin had been postponed at his request during pendency of the related criminal proceedings. On April 1, 1983, four days after Laughlin's criminal case was

---

[4]The *Lovercamp* decision recognized necessity as a defense to escape. The court held the defense was strictly limited, however, to circumstances where the escapee was facing an imminent threat of death, substantial bodily injury or sexual attack, had no opportunity to complain to authorities (or such complaints would have been futile), used no violence in the escape, and turned him or herself in immediately upon reaching a position of safety from the immediate threat. (*People v. Lovercamp, supra,* 43 Cal.App.3d at pp. 831-832.)

[5]Questioned on why he disregarded Laughlin's inability to show this element of the defense, Boyd explained he was concerned less with what Laughlin had done than with the fact prison authorities would testify in support of his defense.

dismissed, a prison disciplinary board found him *guilty* of escape and assessed a loss of 150 days' credit.[6]

The other felony charge pending against Laughlin in March 1983 arose from a strong-arm robbery perpetrated in November 1980 at a residence near Twentynine Palms. The elderly victim was unable to describe or identify his assailants, and the next day said he could not recall anything about the incident. The victim's housekeeper, however, was able to describe one of the two perpetrators. In November 1981, the witness identified Laughlin from a photographic display. According to a 1981 file note, Laughlin admitted, in a police interview, to having participated in the robbery.

Laughlin was charged with robbery in November 1981, and a preliminary hearing was eventually scheduled for April 6, 1983 (the reason for most of this delay is not apparent from the record). On March 29, 1983, however, the case was dismissed, on prosecution motion, for "insufficient evidence." There is no other written record of the reason for this decision.

The deputy district attorney in charge of the robbery case testified at the evidentiary hearing that he had no independent recollection of the case, that on review of the available documents it looked "triable" but had "problems," including the victim's lack of memory of the incident. He also testified he did not recall anyone urging dismissal because Laughlin was testifying for the People in a death penalty case, and that he would probably remember such an unusual conversation had it happened.

Laughlin's appointed attorney on both the escape and robbery cases was James Michael Welch. On the escape charge, Welch, like prosecutor Boyd, recalled believing a prison disciplinary board had upheld Laughlin's *Lovercamp* defense, but he could not recall who had given him that impression: "It might have come from the D.A. or it might have come from Mr. Laughlin."

One of Welch's handwritten notes in his file on the escape case reads, "Talk to Bill Arthur." Welch billed the county for 15½ hours of out-of-court time on the escape case, justifying the bill with the following statement: "I had to spend many hours with this defendant at the County Jail in San Bernardino since he was working with the San Bernardino Sheriff's Office Homicide detail on two pending investigations. He has testified in those proceedings and this has occasioned the number of hours I needed to be with him."

---

[6]The penalty was later reduced to 45 days' credit, the maximum penalty at the time of the escape. Finally, the charge was reheard at Laughlin's request on July 4, 1983. Laughlin was again found guilty of escape but the board reduced the penalty to a warning and reprimand, with a note that the criminal charges had been dismissed.

When Welch, at Laughlin's request, was appointed on the robbery case, Laughlin told him he would not have to do any work on it because the case would be dismissed. Welch did not, in fact, bill for any work on the robbery case.

The above evidence amply supports the referee's findings that Laughlin believed the government had impliedly promised him some form of "consideration" for his testimony in petitioner's case, and that Sergeant Arthur did in fact make such implied promises. Laughlin's June 1, 1989, declaration, his statements in the June 22, 1989, interview with Investigator Vander-Veen, and his testimony on April 28, 1993, all show that Laughlin informed in petitioner's case, as in others, in the hope and expectation of receiving benefits from police and prosecutors; that he knew no direct promises could be made him, but repeatedly told police what he wanted in exchange for his testimony. When he did so he was told not to worry, that he had to "give" before he could "get." Sergeant Arthur specifically referred to dismissal of his escape charge as the type of benefit Laughlin might obtain for his cooperation.

The referee also properly relied upon the circumstances of the escape and robbery charge dismissals as evidence consideration was impliedly promised and delivered. We agree with the referee that the timing of the dismissals and the lack of convincing explanations for dismissing the cases, especially the escape case, strongly suggest a link between Laughlin's assistance in pending murder prosecutions and the extraordinarily lenient treatment he received on his own pending cases.[7] As the referee found, this is an instance when " 'actions speak louder than words.' " That there was some such link is corroborated by Attorney Welch's sworn statement that his work on the escape case included assisting in his client's informing activities on two pending murder investigations.

### Question 5: Opportunity to Fabricate

The referee found that while Laughlin could have obtained his information from petitioner, as he testified at petitioner's trial, Laughlin also "had the opportunity to obtain information from other sources which could have resulted in fabricated testimony at the *Malone* trial." As possible alternative sources of information, the referee identified: (1) police reports available to Laughlin when he shared a cell with petitioner; (2) conversations with

---

[7] Respondent argues the timing shows the *lack* of consideration, since both of Laughlin's pending cases were dismissed just *before* he first testified against petitioner. The dismissals, however, came a few days *after* March 22, 1983, when Laughlin first gave Detective Clifford a detailed, tape-recorded statement of his information against petitioner, a statement which could have been used to impeach Laughlin had he not testified in the manner expected.

Michael Crenshaw, petitioner's accomplice; (3) newspaper articles about petitioner's case; and (4) law enforcement officers.

Petitioner urges us to accept the referee's finding on question 5. Respondent does not take exception to the finding as a whole, but disputes the referee's statement Laughlin could have obtained information from law enforcement officers. Respondent also argues the evidence did not establish Laughlin actually saw any newspaper reports of petitioner's crimes while the two were in jail together.[8]

### Petitioner's Papers as Possible Source

In November and December 1982, Laughlin and petitioner were housed together in an eight-man cell in San Bernardino County jail. During this period Laughlin could have obtained petitioner's confession. As the referee found, however, he could also have obtained information about the crimes from legal materials in petitioner's possession during this period. At trial, the parties stipulated petitioner had in his possession police reports detailing the circumstances of the charged crimes. According to evidentiary hearing testimony, jail inmates had only open cubbyholes for storage of personal property. An inmate could arrange to be in the cell alone, for example by staying back at mealtime.

### Crenshaw as Possible Source

Beginning February 20, 1983, and continuing through the period of Laughlin's informing and testifying in petitioner's case in March 1983, Laughlin and Michael Crenshaw were both housed in the San Bernardino County jail's protective custody unit. According to a former guard, protective custody inmates, although housed in individual cells, were able to communicate with one another. A former inmate, Donald Muckleroy, described the unit as "relatively small" and noted that "everybody knows everybody else's business."[9] By March of 1983, Crenshaw had already confessed to his role in the charged crimes.

---

[8] In addition, respondent takes issue with the referee's statement that Laughlin appears to have adopted Crenshaw's version of events. As respondent points out, there were some significant differences between Crenshaw's and Laughlin's accounts of the crime. The referee remarked, however, only that Laughlin, like Crenshaw, portrayed petitioner as the perpetrator and Crenshaw as a less culpable bystander; the referee did not assert their accounts were in all material ways alike. Respondent does not deny that Laughlin and Crenshaw had opportunities to converse in jail in February and March 1983.

[9] According to Muckleroy, Laughlin pointed Crenshaw out to him and told him Crenshaw and petitioner had been involved in a murder together, that Laughlin was piecing together information on the crime from Crenshaw, newspaper reports, and possibly other sources, and that he intended to use that information to testify against petitioner. Muckleroy's testimony

The evidence thus shows Laughlin *could* have obtained information about the crimes from Crenshaw. In addition, Laughlin has consistently said he *did* obtain such information from Crenshaw. As early as the March 22, 1983, interview with Deputy Clifford, Laughlin, purporting to relate petitioner's account of the Rankin kidnapping, interrupted himself, saying, "Oh! Wait a minute . . . I'm thinking of a statement made by him, his codefendant." In the 1989 VanderVeen interview, Laughlin described having received a detailed narration from Crenshaw, including the murder of the Missouri cabdriver, Parr, the kidnapping and murder of Rankin, and the locations of the White and Benham murders. Both Laughlin's declarations (June 1, and June 27, 1989) also refer to having received information on the case from Crenshaw.

### Newspapers as Possible Source

The evidence supports the referee's statements that Laughlin has an admitted practice of reading and collecting newspaper articles about crimes in which he has taken an interest, and has on occasion used the information so gathered to fabricate information to be offered to law enforcement. Petitioner presented evidence of numerous articles appearing in Riverside and San Bernardino newspapers during the investigation and prosecution of the Benham and White murders. Respondent is correct, however, that petitioner did not establish Laughlin saw any of the newspaper articles or that any of the information Laughlin claimed came from petitioner was contained in articles available to him during the periods he was incarcerated with petitioner in the Riverside and San Bernardino County jails.

### Law Enforcement Officers as Possible Source

The evidence was conflicting as to whether Laughlin may have received any information about petitioner's alleged crimes from law enforcement officers. He testified at the evidentiary hearing, as at petitioner's trial, that he had not learned any details of the case orally from the officers. Deputy Clifford testified at the evidentiary hearing that neither he nor Sergeant Arthur had shown Laughlin reports or discussed details of the case in his presence.

In his June 1, 1989, declaration, Laughlin stated he had overheard police officers discuss details of both the Benham and White killings, and had seen

---

was similar to that of Terry Caylor at petitioner's trial. At the trial, Crenshaw also testified that he talked to Laughlin during this period. Laughlin told Crenshaw he was an undercover policeman and wanted to help Crenshaw. Crenshaw did not testify to any other contents of the conversations, and did not testify at the evidentiary hearing.

police reports in petitioner's case on investigators' desks during interviews. In his subsequent (June 27) declaration, however, Laughlin revised this claim considerably, saying he had seen only an aerial photograph (possibly of the Benham murder scene) in Arthur's office, and had overheard only "bits of information" that he had already learned from petitioner and Crenshaw.

The VanderVeen interview, from which the June 27, 1989, declaration was drafted, sheds some light on the matter. Laughlin explained to Vander-Veen that during the June 1 interview with petitioner's attorneys and investigator, Laughlin had told them certain things "off the record," that is, not for inclusion in a sworn declaration. The off-the-record information was that Laughlin had "overheard things, when things were being discussed between an officer and an officer, while in transportation," and that during interviews "somethings" (*sic*), in particular an aerial photograph, were left out for him to see, he believed intentionally.

Laughlin explained further how he had learned facts of the crime while being transported by Clifford and another officer: "I believe John [Clifford] was elaborating on his opinion that Calvin (*sic*: Kelvin, petitioner) was sick. And something about the body . . . I want, I think it was connected with the photo. I believe they mentioned the weapon and I believe I told them, a pipe, at first I said a gun. And then they said, no it wasn't a gun it was a beating. And then I told them, well I don't totally remember."

With regard to the White killing, Laughlin said an unidentified officer asked him "was I aware that the victim in Blythe was shot point blank in the eye." Laughlin also heard from an officer, possibly Clifford, that the Blythe victim "was an older woman, and sitting in her car, resting or something," before she was "shot in the eye and put in the trunk."

On the basis of this evidence, we agree with the referee Laughlin had the *opportunity* to obtain information on petitioner's alleged crimes from law enforcement officers. Whether Laughlin actually *learned* anything from these conversations is another matter, on which the referee made no finding and which we similarly do not determine. Laughlin told VanderVeen that "to the best of [his] knowledge" he did not learn anything he did not already know. In particular, he said he already knew, before the conversation during transportation, that Benham had been severely beaten; he learned that fact from "Malone and Crenshaw."

*Question 6: Fabrication of Petitioner's Purported Confession*

As previously noted, the referee found: "A review of the evidence that was presented by both sides has caused the undersigned referee to conclude

that Laughlin probably lied when he testified at the *Malone* trial that he received his information from Kelvin Malone." As support for his finding, the referee cited Laughlin's admission to having fabricated his testimony, evidence showing Laughlin's general lack of credibility and respect for the witness oath, and the improbability of Laughlin having waited until March 1983 to reveal his information had he acquired it from petitioner at the times claimed. Petitioner urges us to accept this finding, while respondent argues it should be rejected.

### Admissions of Fabrication

Laughlin has never admitted under oath that he fabricated his trial testimony. In his June 27, 1989, declaration and his evidentiary hearing testimony, he stated his trial testimony was truthful and denied he had ever said otherwise.

Barbara Jordan, an investigator retained by petitioner's attorneys, interviewed Laughlin on the morning of June 1, 1989, while Laughlin was in federal detention. According to Jordan's declaration, Laughlin told her at that time that petitioner had not confessed to him, and that his trial testimony had been based on information obtained from other sources. Jordan returned later that day with petitioner's attorneys, Edward Schulman and Nancy Gaynor. In the presence of all three, Laughlin again admitted he had fabricated the confession to which he testified at trial. Because the attorneys could not assure him he would not face prosecution for perjury, however, he refused to sign a declaration to that effect. Schulman and Gaynor similarly declared Laughlin told them, during the June 1, 1989, interview, that petitioner had not confessed to him. Shulman testified to the same effect at the evidentiary hearing (Jordan and Gaynor did not testify).

There was thus a direct conflict between the declarations and testimony of Schulman, Gaynor and Jordan that Laughlin admitted the fabrication to them, and that of Laughlin denying any such admission. By finding Laughlin "admitted that he fabricated his trial testimony," the referee implicitly resolved this conflict in favor of petitioner's witnesses. For reasons appearing immediately below (Laughlin's extremely poor character for veracity), we agree petitioner's appointed appellate attorneys and their investigator are more credible witnesses than Laughlin, even without regard to the referee's opportunity to observe the testimonial demeanor of Laughlin and Schulman.

Other evidence also supports the finding Laughlin did make the disputed admission. Laughlin and petitioner's witnesses agreed that during the June 1, 1989, interview, Laughlin gave petitioner's witnesses some information that,

out of fear of a perjury prosecution, he would not swear to in a declaration. According to petitioner's witnesses, that information included the admission of fabrication. Laughlin claimed the off-the-record information was merely that he had learned some facts of the crimes from police sources. Laughlin's version, however, is contradicted by the fact the declaration he *signed* on June 1 prominently included the statement that he had overheard police discussions of the facts of the crime and seen police reports on the crimes. Schulman also prepared and showed Laughlin a second declaration, which included the statement that Laughlin had fabricated petitioner's purported confession; Laughlin *refused* to sign that declaration.

### Laughlin's Credibility

There was considerable evidence, in the form of opinion and reputation testimony, that Laughlin had an extremely poor character for veracity. Negative assessments of his truthfulness came from his father ("As a parent you hate to admit that your offspring is a no-good . . . but I would be lying if I said any different."), a former longtime friend ("There is no truth and honesty . . . Charley has a reality within himself and makes the rules up kind of as he goes along."), and several law enforcement witnesses ("not believable"; "I wouldn't use him. . . . [A]bout half of what he told me, he invented"; "If he told me it was daylight, I'd go out and check"; credibility "extremely poor"; "a fabricator . . . a con man . . . a figment of his own imagination").[10]

Perhaps even more important was the evidence showing a pattern of false informing and fabrication of confessions. Evidence was presented of fabrication in three homicide cases in 1981 and 1983: the Rhodes killing, the Reddy prosecution, and the *Sassounian* prosecution.

After his arrest on theft charges in the fall of 1981, Laughlin told authorities he had information regarding Sandra Rhodes, who had been abducted and murdered in San Bernardino County in May 1981, and whose killing was reported in local newspapers as an unsolved crime. In a November 3, 1981, interview with San Bernardino Sheriff's detectives, Laughlin

---

[10]The evidence also supports the referee's statement that the many contradictions in Laughlin's testimony on various occasions "tend[] to establish that he has not taken oaths to tell the truth very seriously." One representative example concerns Laughlin's reasons for escaping from state prison in 1982. At petitioner's trial, he testified he did so because he feared for his life, having been assaulted and seriously injured by other prisoners. In a 1987 Fresno proceeding, in contrast, Laughlin testified he left prison in 1982 in order to see his family in Northern California, rather than because of any problem with other inmates. It seems unlikely even the passage of four years would have made Laughlin forget the severe injuries he claimed, in 1983, to have received in the assault.

gave a detailed account of a conspiracy to kill or injure Rhodes to prevent her from informing on local drug and weapons activities. The plan had, according to Laughlin, been carried out, with Laughlin acting in a minor accomplice role. Further investigation revealed that three men Laughlin identified as participants in the conspiracy and killing had alibis for the relevant period. Laughlin subsequently admitted to one of the detectives his information was "bogus," that "all the information I gave you guys was only what I had heard and read in the paper and heard on the streets. I myself and some other people that I named weren't even involved." The detectives decided Laughlin's information was unreliable; as of 1994, the Rhodes killing remained unsolved.[11]

In May 1983, Laughlin told a San Bernardino detective he had received a detailed confession from Claudy Reddy, who was accused of killing her husband in 1982. Laughlin asserted Reddy told him about the killing during transportation to court. Laughlin claimed to have made notes of the conversation. Laughlin's account of the crime, purportedly learned from Reddy, turned out to be inaccurate in several important respects, including the manner and location of the killing. For that reason, the detective decided Laughlin could not be used, and he did not testify at Reddy's trial. The correct facts Laughlin did recite could have been learned from newspaper accounts.

In July 1983 Laughlin told Los Angeles County law enforcement officers he had information on the *Sassounian* case, in which Harry Sassounian was charged with the politically motivated murder of the Turkish Consul General, Kemal Arikan, in January 1982. (See *In re Sassounian, supra*, 9 Cal.4th at pp. 538-539.) Laughlin claimed that in 1981 he learned of a conspiracy by a group calling itself the Justice Commandos of the Armenian Genocide to kill Arikan. The participants were Sassounian and three other men with Armenian surnames. After an initial interview, he gave the Los Angeles detective two handwritten letters, purportedly received from Sassounian, containing incriminatory remarks. The prosecutor had the letters compared to samples of Sassounian's handwriting and determined they were forgeries. After further inquiries, the prosecutor concluded Laughlin was unreliable and did not use him in the *Sassounian* prosecution. The names Laughlin had

---

[11]In a February 1983 interview with Sergeant Bill Arthur, Laughlin again admitted he had fabricated his 1981 information in the hope of getting his bail reduced on the pending theft charges. He then told Arthur a completely different story, according to which Laughlin had no involvement, there had been no conspiracy, and Rhodes had been killed by one man in an attempted rape.

provided as conspirators were those of acquaintances unconnected with the crime.[12]

### Timing of Laughlin's Disclosures

The referee reasoned that "if Malone had actually confessed to Laughlin during the periods of time Laughlin claims he did, neither Laughlin nor the respondent offered any reasonable explanation as to why Laughlin waited so long to offer such information to the officials who were handling the *Malone* prosecution." We agree with the referee: the timing of the disclosure suggests Laughlin drew his information from conversations with Crenshaw rather than petitioner.

In late 1981, Laughlin and petitioner were both being held at the Riverside County jail in Indio. Laughlin claimed to have learned much of his information—including circumstances of the Rankin, White and Benham killings—from petitioner during this period, in conversations near the booking counter and library, where both went to use the telephone.[13] At the time, Laughlin was facing grand theft charges and, in the hope of getting his bail reduced, was providing information in the Rhodes homicide and Riordan robbery cases. He also feigned severe mental illness or retardation in December 1981, thereby delaying prosecution on the theft charges for several weeks. Yet during this period Laughlin did not tell any law enforcement officer of the confessions to multiple murders he claims to have obtained from petitioner, who Laughlin knew was facing murder charges for those crimes in Riverside and San Bernardino Counties.

Laughlin claimed to have discussed the crimes further with petitioner when they shared an eight-man cell in San Bernardino County jail in November and December 1982. During these months, and during January

---

[12]In Sassounian's trial, Laughlin testified for the *defense*, impeaching the testimony of another jailhouse informant, Jeffrey Busch. Laughlin admitted he had fabricated the incriminatory information and had shared it with Busch. (See *In re Sassounian, supra,* 9 Cal.4th at pp. 540-541.) In the 1989 VanderVeen interview, Laughlin again admitted his information had been fabricated from published accounts of the crime, that he had intended to give it to the authorities, but that Busch had "beat me to the punchline."

[13]The evidence called into considerable question whether extended confidential conversations could have taken place in the Indio jail at the time and place Laughlin claimed. Petitioner was a maximum security prisoner, deemed a very high escape risk. When he left his cell to use the telephone, he was escorted by a deputy, who would stay with him the entire time. Petitioner would not have been permitted to talk with other inmates during a telephone call trip. Laughlin was classed as maximum security/protective custody, and would also have been observed, and not permitted to converse with other inmates, while using the telephone. Although an inmate could have been in the law library while another was using the telephone, it would not have been possible for the two to talk in a normal tone of voice: they would have had to shout.

and February 1983, Laughlin was attempting to get his prison sentence for theft reduced and was facing additional felony charges for escape and robbery. He provided information to Sergeant Arthur and Deputy Clifford in the Roberts murder case and other matters. Yet at no time during these months did Laughlin mention to Arthur, Clifford, or other San Bernardino authorities that he had information on petitioner's alleged participation in the San Bernardino County murder.

On February 25, 1983, Laughlin was moved to protective custody in the San Bernardino County jail. There he talked with Crenshaw about the latter's criminal activities with petitioner. On March 10, 1983, during transportation to the Morongo Basin Station, Laughlin first revealed to Clifford and Arthur that he had information about petitioner's crimes.[14]

*Conclusion*

From this record, it is impossible to know with certainty whether Charles Laughlin lied or told the truth at petitioner's trial. Petitioner's burden, however, is only to prove his claims by a preponderance of the evidence. (*In re Sassounian, supra,* 9 Cal.4th at p. 546.) On the basis of all the evidence, we agree with the referee Laughlin probably lied when he testified petitioner confessed to him the Benham, White and Rankin crimes.

In the June 1, 1989, interview with petitioner's attorneys and investigator, Laughlin admitted having fabricated the confession. On later occasions he denied fabrication. While Laughlin's low credibility militates against fully trusting his statements on any occasion, arguably the June 1, 1989, admissions of fabrications are more credible than the later denials, because these admissions to perjury were against Laughlin's penal interest.[15] The June 1, 1989, admissions were corroborated by a similar admission of fabrication made to fellow San Bernardino County jail inmate Donald Muckleroy in February or March of 1983.

Like the referee, we find especially probative the lapse in time between when Laughlin claimed to have received petitioner's confessions and when

---

[14]Laughlin later produced notes of a purported conversation with petitioner on March 15, 1983. According to these notes, the fairly lengthy conversation, in which petitioner again made incriminating statements regarding the Benham, White and Rankin killings, took place while petitioner was in a holding cell "downstairs" on his way to or from taking a shower. Again, testimony of a jail deputy casts doubt on whether such a confidential conversation between petitioner and Laughlin could have occurred.

[15]As respondent points out, however, it is also possible Laughlin told petitioner's attorneys what they wanted to hear in the hope they would somehow assist him in his current problems. About a week after the June 1, 1989, interview, Laughlin called Schulman and asked for his help in persuading federal authorities not to transfer Laughlin to custody in Louisiana.

he revealed his information to law enforcement officers. Neither Laughlin nor respondent offers an adequate explanation for the delay.

Finally, petitioner showed Laughlin had, around the time of his informing in this case, a practice of fabricating information on pending criminal matters and offering it to law enforcement in the hope or expectation of receiving beneficial treatment in his own cases. He also showed that implied promises of such treatment were made Laughlin in petitioner's case and that Laughlin actually received lenient treatment in his escape and robbery cases. For all these reasons, we accept the referee's finding on question 6 as on the other questions.

## III. ENTITLEMENT TO RELIEF

### Juror Misconduct

It will be recalled that during deliberations Jury Forewoman Dianne Irwin expressed negative opinions on the reliability of petitioner's polygraph evidence, based on her own professional study of psychology. ■ It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct. (*In re Stankewitz* (1985) 40 Cal.3d 391, 397, 399-400 [220 Cal.Rptr. 382, 708 P.2d 1260]; *Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1746 [286 Cal.Rptr. 435].)[16]

■ A juror's misconduct raises a presumption of prejudice, which may be rebutted by proof no prejudice actually resulted. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 835 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Marshall* (1990) 50 Cal.3d 907, 949 [269 Cal.Rptr. 269, 790 P.2d 676].) "A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a *substantial likelihood* that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the

[16]Respondent contends Irwin's statements were not misconduct because they concerned matters properly before the jury through trial evidence. As discussed below, respondent is correct most of Irwin's assertions merely reflected evidence and argument presented in the trial, and were less egregious for that reason. Her assertion that this information was drawn from her own professional knowledge, however, was an improper injection of extrajudicial specialized information into the deliberations.

defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' [Citations.] . . . [¶] 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.' " (*People* v. *Marshall, supra,* 50 Cal.3d at pp. 950-951, italics added.)

"Such 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental unfairness and calls for reversal without consideration of actual prejudice. [Citation.] Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial. By contrast, when the misconduct does not support such a finding, we must hold it nonprejudicial." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951; accord, *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1109-1110 [269 Cal.Rptr. 530, 790 P.2d 1327]; *People* v. *Cooper, supra,* 53 Cal.3d at p. 838; *In re Carpenter* (1995) 9 Cal.4th 634, 650-651 [38 Cal.Rptr.2d 665, 889 P.2d 985].)

■ The People have successfully rebutted the presumption of prejudice in this case by showing the externally derived information was substantially the same as evidence and argument presented to the jury in court. It was therefore not inherently likely to have exercised an improper influence on any of the jurors.

Irwin told her fellow jurors that while polygraph examiners claim accuracy rates of 80 or 90 percent, studies by psychologists had found accuracy of only 50 or 60 percent. At trial, petitioner's polygraph examiner testified, on direct examination, that both his own experience and published studies showed accuracy of 90 percent or more. On cross-examination, he conceded that other studies, including one by a prominent psychologist, put the accuracy of the polygraph at around 60 percent.

Irwin also told her fellow jurors the exact wording of a polygraph question was important and expressed her belief the results here were made unreliable by an ambiguity in the key question regarding petitioner's role in the killing of Benham. Substantially the same ambiguity had been fully explored at

trial. The polygrapher opined petitioner had truthfully answered "No" to the question, "Did you, yourself, kill that woman from the service station in Baker?" On cross-examination, the witness acknowledged the question could be interpreted as referring to a killing in Baker (rather than Daggett, where the killing occurred) and that such an ambiguity could lead to an incorrect result. In argument, the prosecutor again explained the ambiguity and how it could have led to a false finding of truthfulness.

Because Irwin's assertions were substantially the same as evidence and argument presented at trial, her error was much less egregious than similar misconduct we have found warranted reversal. (See *In re Stankewitz, supra*, 40 Cal.3d at pp. 396-397, 399-400 [juror made erroneous statement of law that contradicted jury instructions]; *Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co., supra*, 234 Cal.App.3d at p. 1749 [juror presented demonstration to other jurors different from those conducted by expert witnesses at trial].) Viewed in context of the evidence at trial, the misconduct here does not support a finding that at least one juror was improperly influenced to petitioner's detriment.[17]

*False Evidence*

■ Penal Code section 1473, subdivision (b)(1), allows relief on habeas corpus where the petitioner shows "substantially material or probative" false evidence was introduced against him on the issues of guilt or punishment. We recently explained the materiality standard for false evidence as follows: "False evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that '*with reasonable probability* it *could have* affected the outcome . . . .' (*In re Wright* (1978) 78 Cal.App.3d 788, 814 [144 Cal.Rptr. 535], italics added (per Kaufman, J.).) In other words, false evidence passes the indicated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different. (*Ibid.*) The requisite 'reasonable probability,' we believe, is such as undermines the reviewing court's confidence in the outcome. (Cf. *United States* v. *Bagley* [(1985)] 473 U.S. [667,] 678 [87 L.Ed.2d 481, 491] [dealing with prosecutorial nondisclosure of evidence in violation of the Fourteenth Amendment's due process clause].) It is dependent on the totality of the relevant circumstances. (*In re Wright, supra*, 78 Cal.App.3d at p. 817.) It is also, we believe, determined objectively. (Cf. *Strickland* v. *Washington* [(1984)] 466 U.S. [668,] 695 [80

---

[17]Petitioner does not claim, and the record would not support a finding, that because of Irwin's misconduct Irwin or any other juror was "actually biased" against him. (*In re Carpenter, supra*, 9 Cal.4th at p. 653.) Nor need we consider in this case the extent to which other evidence of guilt, unrelated to the jury misconduct, may rebut a presumption of prejudice. (*Id.* at pp. 654-655.)

L.Ed.2d 674, 698] [dealing with ineffective assistance of counsel in violation of the Sixth Amendment].)" (*In re Sassounian, supra*, 9 Cal.4th at p. 546.)[18]

Applying the above standard, we ask whether Laughlin's false testimony as to receiving petitioner's confessions to the Benham, White and Rankin murders bore a reasonable probability of affecting the jury's verdicts and findings on the first degree murder of Benham, the felony murder special circumstances, or the penalty of death. Considering Laughlin's testimony in light of all the evidence at trial, we conclude Laughlin's evidence was substantially material as to the felony murder special circumstance allegations, but not as to guilt of first degree murder or the choice of penalty.

At the outset, we must reject petitioner's claim that our analysis of the materiality of Laughlin's testimony requires us to assume not only the absence of that testimony, but of Crenshaw's testimony as well. Petitioner asserts that, without Laughlin's testimony regarding the Benham killing, Crenshaw's testimony either would have been excluded because of the requirement an accomplice's testimony about the crime be corroborated (§ 1111), or the jury, instructed on the corroboration requirement (CALJIC No. 3.11), would have ignored Crenshaw's account.

Crenshaw's account of the kidnap, robbery and beating death of Benham, however, was corroborated by other evidence: Benham, along with the cash insert from the register drawer, was missing from the gas station where she was working; the cash insert was found along the road from Baker to the murder scene (Crenshaw testified petitioner threw it from the car); Benham's body was found in the position and state of undress Crenshaw described, and her wounds were consistent with the beating Crenshaw claimed to have seen petitioner inflict. Petitioner's participation in the robbery and kidnapping, which he admitted, was independently shown by his connection to Rankin's car, as the tread pattern of the car's tires matched marks found at the Benham murder scene, and by his possession, when arrested, of Benham's wedding ring set. Thus, even in the absence of Laughlin's testimony,

---

[18]Petitioner also cites decisions discussing, and imposing a lower standard for determining the materiality of, perjured testimony *knowingly* presented by the prosecution. (See *In re Jackson, supra*, 3 Cal.4th 578, 597-598.) Although his brief is not explicit on this point, petitioner apparently contends the prosecution knew or should have known Laughlin's testimony of a confession by petitioner was false. The petition can be read as making such a claim. To the extent the claim was made, however, it was impliedly denied by our failure to include it in the order to show cause and is no longer before us. (See *In re Clark* (1993) 5 Cal.4th 750, 781, fn. 16 [21 Cal.Rptr.2d 509, 855 P.2d 729] [order to show cause limits subsequent proceedings to claims embraced by order].) Because a claim of knowing use of false confession evidence was not within the scope of the order to show cause or the reference order, the referee made no findings concerning such a claim.

Crenshaw's testimony would have been admitted and considered by the jury.[19]

*Materiality as to First Degree Murder*

■ Proceeding to the issue of materiality as to guilt, we readily conclude Laughlin's testimony had no reasonable probability of affecting the guilty verdict for first degree murder. The jury was instructed on a robbery-murder theory of first degree murder as well as on premeditated first degree murder. Although the prosecutor maintained petitioner killed Benham himself, he urged the jury to convict petitioner of first degree murder even if petitioner's testimony led them to have some doubt on the point. The prosecutor explained that, as to the murder charge, "It doesn't matter who killed Mrs. Benham. It's as simple as that. It just doesn't matter at all."

Petitioner admitted full participation in the robbery of Benham at the gas station. His attorney argued he was not subject to murder or special circumstance liability for the killing, however, because the gas station robbery was complete before Benham was killed. Counsel characterized the robbery charge as relating only to the taking of cash, not to the taking of Benham's rings; he argued the robbers had reached a place of temporary safety, the cabin near Daggett, before Benham was killed. In rebuttal, the prosecutor argued the robbery was one offense, even though the money was taken at the gas station and the rings at the cabin where Benham was killed; the robbery thus continued through Benham's killing.

Even without Laughlin's testimony that petitioner was the actual killer of Benham, the jury was not likely to accept petitioner's defense to the robbery murder. The jury was correctly instructed that for felony-murder purposes a robbery continues until the perpetrator "has reached a place of temporary safety and is in unchallenged possession of the stolen property." (CALJIC No. 9.15 (4th ed.); see *People* v. *Cooper* (1991) 53 Cal.3d 1158, 1170 [282 Cal.Rptr. 450, 811 P.2d 742].) Petitioner and Crenshaw could not reasonably be regarded as having reached a place of temporary safety with the cash taken at the gas station while they still had the kidnapped victim under their control in a public place. (See *People* v. *Carter* (1993) 19 Cal.App.4th 1236, 1252 [23 Cal.Rptr.2d 888] ["A robber who has kidnapped his victim is 'continuously in jeopardy' during the period of captivity because at any 'unguarded moment' the victim might manage to escape or signal for help."].)

---

[19]Petitioner also invites us to speculate that *he* would not have testified if not for the need to contest Laughlin's and Crenshaw's versions of the Benham crimes. We have no basis on which to say what decision petitioner would have made in those circumstances; in any event, we have already rejected petitioner's premise that Crenshaw's testimony, along with Laughlin's, should be disregarded.

Nor, during the kidnapping, could the robbers reasonably be considered in unchallenged possession of either the money or Benham's rings, which remained either on her person or in her immediate presence. As far as the evidence showed, Benham's rings were on her person until she was killed. The robbery, for that reason, could not have been complete before the killing. (§ 211; see also *People* v. *Cooper*, *supra*, 53 Cal.3d at p. 1166 [" 'gaining possession' " element of robbery not complete until property taken from victim's person or immediate presence].)

Contrary to defense counsel's argument, the charge against petitioner was not limited to robbing the cash register, nor could the taking of Benham's rings reasonably be regarded as a separate offense of robbery. (See *People* v. *Harris* (1994) 9 Cal.4th 407, 421 [37 Cal.Rptr.2d 200, 886 P.2d 1193] [single offense of robbery was ongoing while victim was held continuously captive during four separate takings at different locations]; *People* v. *Rush* (1993) 16 Cal.App.4th 20, 24-25 [20 Cal.Rptr.2d 15].) The evidence in this case left the jury little choice but to find Benham was killed in the course of a single robbery, which petitioner admitted intentionally committing. Such a finding compelled a first degree murder conviction. For this reason, Laughlin's testimony supporting the alternative theory of premeditated first degree murder was not substantially material or probative on the charge of first degree murder.

*Materiality as to the Felony-murder Special Circumstances*

■ We next consider whether Laughlin's testimony was substantially material or probative to the special circumstance allegations that the murder was committed in the course of robbery and kidnapping. (§ 190.2, subd. (a)(17)(i), (ii).) In petitioner's trial, conducted prior to this court's decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], the court instructed the jury that if petitioner were not Benham's actual killer, but intentionally aided and abetted in her murder, the felony-murder special-circumstance allegations could be found true only if petitioner " 'intended that the killing take place.' " (*People* v. *Malone*, *supra*, 47 Cal.3d at p. 25.)

The guilt phase evidence presented a direct conflict between petitioner's and Crenshaw's versions of events, centering on who actually entered the shack and killed Benham. Petitioner insisted he neither killed Benham nor intended she die; under the instructions just referred to, the special circumstance allegations would thus be untrue if his version were accepted. According to Crenshaw, on the other hand, petitioner himself beat Benham to death. Not surprisingly, the attorneys for both sides argued this question—

whether petitioner was Benham's actual killer—extensively. Because the identity of Benham's actual killer was legally critical to the felony-murder special-circumstance allegations, we must decide whether Laughlin's testimony bore a reasonable probability of influencing the jury on the question.

We earlier rejected petitioner's argument that Crenshaw's testimony would have been inadmissible without corroboration by Laughlin. Petitioner's corroboration argument is nonetheless correct in one important respect: Laughlin's testimony provided the only evidence directly corroborating Crenshaw's claim that petitioner, rather than (or in addition to) Crenshaw himself, was Benham's actual killer.[20] Crenshaw had an obvious motive to lie on that point, and the jury was instructed to regard his testimony with distrust, as well as on the need for corroboration. The prosecutor told the jury that while Crenshaw might not be telling the whole truth, his version of what happened in the shack was corroborated by petitioner's confession to Laughlin. We are compelled to conclude Laughlin's testimony, which corroborated Crenshaw's in this important respect, was substantially material and probative on the hotly disputed question of whether petitioner was the actual killer of Benham. That question, in turn, was of considerable importance to the truth or falsity of the felony-murder special circumstance.

Respondent argues Laughlin's false testimony should not be considered material on *any* issue, because he was "extensively impeached" at trial and because "overwhelming independent evidence" supports the jury's verdicts. Respondent compares this case to *In re Sassounian, supra*, 9 Cal.4th 535, in which this court held a jailhouse informant's testimony regarding the petitioner's purported confession, even if false, was not substantially material or probative.

In *Sassounian*, we noted first that while a confession can in some cases provide the prosecution with an " 'evidentiary bombshell,' " its effect in a given case depends on whether the jury would have found it believable. (*In re Sassounian, supra*, 9 Cal.4th at p. 548.) Because the *Sassounian* informant had been extensively impeached at trial, we believed it "open to question" whether the jury did rely on his testimony to any substantial degree. (*Ibid.*)

Second, our review of the record in *Sassounian* showed there was overwhelming evidence, separate and apart from the informant's testimony, as to

---

[20]Laughlin's and Crenshaw's versions of events were not identical. Laughlin testified petitioner told him Benham was put in the passenger compartment of the car and struggled during the trip to the murder scene, while Crenshaw testified petitioner put Benham in the trunk when she was kidnapped. In addition, according to petitioner's purported confession to Laughlin, Crenshaw held Benham while petitioner beat her; Crenshaw denied any involvement in the actual killing.

both the charged first degree murder and the charged special circumstance of a killing motivated by national origin. (§ 190.2, subd. (a)(16).) On the special circumstance issue, we found "only one reasonable inference" that could arise from the evidence, that Sassounian killed the victim because the victim was Turkish. (*In re Sassounian, supra,* 9 Cal.4th at p. 549.) The evidence, apart from the informant's testimony, showed Sassounian harbored anger and contempt for Turks and did not support an inference of any other motivation for the killing, such as personal animus, kidnapping or theft. (*Ibid.*)

We first compare the extent of impeachment of the informants at trial. In *Sassounian* evidence was admitted showing the informant, Jeffrey Busch, did not have the opportunity to obtain Sassounian's confession in the manner to which he testified. Busch incorrectly identified the location of the killing and the weapons used. He also incorrectly identified Sassounian's accomplices, and the incorrect names he provided belonged to acquaintances of another inmate—Charles Laughlin, ironically—who testified he had provided the names to Busch in an attempt to fabricate evidence against Sassounian. Laughlin and another inmate testified for the defense that Busch had fabricated the purported confession. Busch was unable to identify Sassounian from a photograph and admitted he had solicited benefits in exchange for his testimony. He also admitted felony convictions for burglary. (*In re Sassounian, supra,* 9 Cal.4th at pp. 540-541.)

At petitioner's guilt phase trial, Laughlin admitted he had been convicted of grand theft and had escaped from state prison. He admitted his escape and robbery charges had been dismissed on prosecution motion, but insisted the escape case was dismissed because of his *Lovercamp* defense and the robbery because of a speedy trial violation. He admitted he was testifying for the prosecution in three other current cases. Three other cellmates of both petitioner and Laughlin testified petitioner made no statements about his alleged crimes to Laughlin in their presence, and the parties stipulated petitioner had in his possession police reports reflecting the circumstances of the crimes. (See *People* v. *Malone, supra,* 47 Cal.3d at pp. 33-34.)

In the guilt phase, Crenshaw testified Laughlin approached him in protective custody, claiming to be an undercover police officer and offering his help. However, Terry Caylor's testimony—that Laughlin told him he was getting information from Crenshaw to use against petitioner—was not presented until the penalty phase.

Unlike the *Sassounian* informant, Laughlin did not testify to any demonstrably *incorrect* circumstances of the Benham murder. Although evidence

showed Laughlin had the opportunity to fabricate a confession (from police reports or from Crenshaw), there was no question but that he knew petitioner and might have obtained a confession from him when they shared a cell in the San Bernardino County jail. Unlike the *Sassounian* case, in petitioner's trial there was no evidence at the guilt phase of an admission by Laughlin to having fabricated petitioner's confession. Laughlin, unlike Busch, did not admit to seeking benefits for his testimony, and while questions were raised regarding the dismissal of his two pending cases, his claim that both were dismissed for legitimate legal reasons was not expressly contradicted.

Although the guilt phase jury thus did hear significant evidence impeaching Laughlin, we conclude the evidence was not so devastating as to ensure the jury would not have relied on Laughlin's testimony as corroboration of Crenshaw's. We cannot be confident the jury completely discounted the evidence that petitioner had confessed, consistently with the testimony of the only other eyewitness, Crenshaw, to having himself beaten Benham to death in the shack.

Moving to the second part of the *Sassounian* analysis, we are also unable to find the noninformant evidence *on the question of who actually killed Benham* was overwhelming or allowed for only one reasonable inference. Crenshaw, as already mentioned, had a strong motivation to lie, and the jury was properly instructed to view his testimony with distrust.

The circumstantial evidence cited by respondent, while probative, is far from overwhelming on this particular question. While petitioner originally had possession of both guns, that he had given one to Crenshaw in Missouri, long before the Benham killing, was undisputed. Petitioner was larger than Crenshaw, but there was no evidence Benham's killing required the use of force only petitioner could have provided. Respondent points out that petitioner, when arrested, had Benham's wedding ring in his possession; but evidence showed Crenshaw also had one of Benham's rings in *his* possession when arrested.

Petitioner admitted seeking out Crenshaw near the beginning of his crime spree, giving him a gun to use and enlisting him in a plan to commit armed robberies and car thefts on their way back to California. Petitioner also admitted taking the lead during the crime spree in other ways: in stealing cars; in driving, at least during the Benham kidnapping; and in forging Rankin's name on a credit card slip to purchase gasoline.

Independent evidence also suggested petitioner lied when he claimed noninvolvement in the Rankin and White killings, and when he denied ever

having been at the shack where Benham was killed. As the prosecutor pointed out in guilt phase argument, petitioner's explanation of how he and Crenshaw obtained Rankin's car was highly incredible. According to that version, Rankin came out of a restaurant, opened his car door, took off his jacket and put it on the seat, then got into a different car with a woman and drove some distance away in the parking lot. He left his jacket, keys and credit cards in his own car, which petitioner then stole. Rankin's wife testified she never saw him again. She also testified he kept his credit cards in his wallet, which he carried in his back pants pocket. That Rankin coincidentally disappeared on the same night as petitioner stole his car is unlikely. Still more unlikely is that he took off his jacket, on a night petitioner described as "real cold," and then walked away forever, leaving behind credit cards that he always carried in his back pants pocket.

Petitioner similarly denied any involvement in or knowledge of the White killing. He testified that as he and Crenshaw were returning on Highway 15 from Las Vegas (where they went after killing Benham), he became tired and so "told" Crenshaw to drive. He woke up once at a gas station in Vidal Junction, then fell asleep again. When he next woke up it was turning light, the car was parked by the side of a two lane road, and Crenshaw was nowhere to be seen. Crenshaw eventually appeared from the bushes and said he had gone to relieve himself. When petitioner drove on, he discovered they were on Highway 95, somewhere in the vicinity of Blythe, the area in which White was killed.

The defense theory was apparently that Crenshaw had encountered and shot White while petitioner was asleep, and loaded her body into the trunk of her car. Petitioner claimed to have known nothing about Minnie Ola White until after his arrest. Petitioner, however, had rings belonging to White on his person when arrested, her credit cards were in the car he had been driving, and a piece of otherwise unexplained skin tissue consistent with her blood type was found on his trousers.

Finally, in his pretrial polygraph examination petitioner answered "No" to the question, "Were you ever at that shack where they found that woman's body?" At trial, however, he testified he *was* at the shack. It thus appears he was lying on one of these occasions, probably the first.

From the implausibility of petitioner's testimony regarding Rankin and White, and his evident lie about having been at the shack where Benham was killed, the jury would likely find he had lied on one or more occasions about his involvement in these crimes. From this, together with the evidence petitioner generally took a leading role in the crime spree, they *could* infer

he was also lying when he denied being involved in, or even knowing of, Benham's actual killing. This evidence nonetheless falls short of compelling a conclusion petitioner was the person who actually beat Benham to death.

Petitioner and Crenshaw each testified the other was the killer. Petitioner's testimony was corroborated, to some degree, by the evidence of his polygraph examination; it was undermined, as outlined above, by the evidence of his other falsehoods. In the absence of Laughlin's testimony, Crenshaw's testimony—inherently suspect because of his motivation to lie—would have had no corroboration on this particular point. We cannot say here, as in *Sassounian*, that the independent evidence was overwhelming on this key fact pertinent to the special circumstance allegations. Nor, as discussed above, was Laughlin so thoroughly impeached at the guilt trial that we can be confident the jury accorded his testimony no weight. In these circumstances there is a reasonable probability—a probability sufficient to undermine our confidence in the outcome—Laughlin's testimony could have affected the jury's verdict on the felony-murder special-circumstance allegations.

### Materiality as to the Death Penalty

We must decide, finally, whether it is reasonably probable Laughlin's false testimony could have affected the jury's decision in favor of death as the proper penalty. As a consequence of our previous conclusion, we will assume, for purposes of the penalty phase analysis, the nonexistence of the felony-murder special-circumstance findings with their implied finding that petitioner either personally killed or intended the death of Benham. The murder of Benham would still bear a potential death sentence because of petitioner's prior conviction for the first degree murder of White (§ 190.2, subd. (a)(2)), a special circumstance found true by the jury on evidence entirely independent of Laughlin's false testimony.

Without Laughlin's false testimony at the guilt and penalty phase, the jury would not have heard any of the following matters relevant to choice of penalty: Laughlin's corroboration of Crenshaw's testimony that petitioner beat Benham to death; petitioner's confession to robbing and shooting White; petitioner's confession to kidnapping Rankin and later shooting him after making him plead for his life; and petitioner's statements to Laughlin that he killed people to avoid leaving "live clues," because "he enjoyed taking things from individuals and staying on top," and because it gave him sexual gratification.

As we have already discussed, however, even without Laughlin's testimony the jury knew the following: petitioner was responsible for Benham's

murder because of his full participation in her robbery and kidnapping, in the course of which she was killed; White was killed with the gun Crenshaw was carrying; petitioner was with Crenshaw during the general time period of White's death, was found with her rings and credit cards and with skin tissue compatible with hers on his person, and had been found guilty of her first degree murder; petitioner's explanation of how he obtained Rankin's car and other property was implausible, and the evidence strongly indicated Rankin's "disappearance" was the work of petitioner and Crenshaw.

At the penalty trial, the prosecution also presented evidence petitioner had fatally shot William Parr, the taxi driver killed near Crenshaw's Berkeley, Missouri, home. Parr had last been dispatched to make a delivery to a bank around the corner from the Greyhound bus terminal in St. Louis. He was later found in a Berkeley park, shot in the back of the head with a bullet determined to have come from petitioner's Galesi pistol, which petitioner testified he, rather than Crenshaw, carried during their joint crimes. Parr's taxi was found parked a few houses away from Crenshaw's home.

The penalty jury had before it evidence of still other crimes of force or violence. Petitioner injured a guard while escaping from Monterey County jail in February 1981. On March 10, 1981, he robbed gas station attendant Michael Buss in Arroyo Grande (San Luis Obispo County). On March 11, he kidnapped at gunpoint Santa Maria resident Leroy Combs in Combs's car, forced him to drive to Los Angeles, then put him in the car trunk and drove to Long Beach, where Combs was released. Parr was killed March 17, Rankin was last seen March 18, Benham was killed March 20 and White's body was found March 21. Petitioner was finally arrested in San Jose on March 24, after knocking one police officer to the ground with the car he was driving and leading officers on a high-speed chase culminating in a collision between petitioner's car and a police car. (See *People* v. *Malone*, *supra*, 47 Cal.3d at pp. 12-14.) Also introduced was evidence petitioner aided and abetted in the forcible sodomy of a state prison inmate in August 1982, and that in 1979 petitioner and a companion had robbed a Missouri judge at gunpoint. (*People* v. *Malone*, *supra*, 47 Cal.3d at p. 15.)

Petitioner presented considerable evidence regarding his difficult childhood and his residual social and psychological problems, but the penalty jury apparently found this potentially mitigating evidence outweighed by the aggravating circumstances. Is there a reasonable probability this balance would have been altered had Laughlin's false confession evidence not been before the jury? For several reasons, we do not believe so.

First, Laughlin had, as already discussed, been significantly impeached at the guilt trial with evidence of his theft conviction, the dismissal of his

escape and robbery charges, and evidence he could have fabricated the purported confession from information learned from police reports or Crenshaw. In the penalty phase, with the testimony of Terry Caylor, the defense tied motive to fabricate and opportunity together, and thus further undermined Laughlin's remaining credibility. Caylor testified Laughlin admitted to him he planned to testify against petitioner, for benefit to himself, using information he would "piece together" from Crenshaw and police sources. Although Caylor was impeached with his felony convictions, no evidence was presented he had a specific motive to testify falsely in petitioner's favor. Thus the jury's assessment of Laughlin's credibility, and the degree of reliance on his testimony, were likely to be somewhat reduced in the penalty phase.

Second, even without Laughlin's evidence the penalty jury had before it an appalling record of violent crime. In the February-March 1981 crime spree alone, petitioner committed or participated in three (or four, counting Rankin) robbery murders, two including kidnapping as well, one additional armed robbery, a kidnapping at gunpoint, a forcible jail escape and an assault on an officer. Evidence was also presented of participation in another armed robbery and an in-prison forcible sodomy.

Petitioner argues Laughlin's testimony regarding petitioner's purported admissions as to motive (that he killed people for sexual gratification, power and to eliminate witnesses) and circumstances indicating callousness (that he made Rankin plead for his life before shooting him) were particularly material to the jury's choice of sentence, and were relied upon by the prosecutor in penalty phase argument.

The motive of eliminating witnesses, however, was fairly obvious from the killing of Rankin and Benham after they were robbed and kidnapped. The robbery murders of Parr, Rankin, Benham and White were, on their face, callous crimes demonstrating indifference to human life. Although in his summation the prosecutor did employ Laughlin's testimony on these points, he also argued that the circumstances of Benham's death, alone, justified the death penalty, and that the "bottom line" was that petitioner, who was capable of choosing whether or not to commit violent crimes, had chosen to murder four people.

Third, even without Laughlin's testimony pinpointing petitioner as the actual killer of Rankin, Benham and White, the jury would probably not have concluded petitioner bore little or no responsibility for these crimes. Petitioner himself testified he sought out Crenshaw and enlisted him in a plan to commit armed robberies and car thefts on the way back to California.

Petitioner was the larger man of the two, provided the guns for his and Crenshaw's escapade, and led or directed Crenshaw in some of their actions. The Parr murder, the Combs kidnapping and the Buss robbery were all tied to petitioner with no evidence of Crenshaw's participation. Petitioner's apparently false exculpatory statements about Rankin, Benham and White showed his consciousness of guilt as to those victims' deaths.[21] The jury found, and was instructed to consider as a special circumstance, that petitioner had been convicted of first degree murder in the death of White. (See § 190.3, factor (a).) The penalty jury had before it overwhelming evidence, independent of Laughlin's testimony, that petitioner was guilty of first degree robbery murder in Benham's death. It is unlikely the penalty jury, even without Laughlin's testimony, would have accepted petitioner's argument that Crenshaw bore sole, or even primary, responsibility for the killings of Rankin, Benham and White.

The independent evidence thus virtually compelled a conclusion petitioner was at the least a major participant in three, and probably four, murders within a short time period, as well as committing other unprovoked and dangerous crimes of force and violence. For these reasons, the absence of Laughlin's testimony would not fundamentally have altered the balance of aggravation and mitigation before the penalty jury. We therefore conclude the false evidence was not substantially material or probative as to the jury's choice of sentence.

### Prosecutorial Failure to Disclose Promises

 Petitioner also claims entitlement to relief on the ground he was deprived of due process by the prosecutor's suppression of material evidence favorable to the defense, to wit, the implied promises of leniency made to Laughlin in exchange for his testimony.

The standard of materiality applicable to a prosecutorial failure to disclose evidence is the same as the standard we applied above to the false evidence claim: the evidence was material only if there is a reasonable probability its disclosure would have affected the result. (*In re Sassounian, supra,* 9 Cal.4th at p. 544.)

In *Sassounian,* as here, the petitioner claimed entitlement to relief both because an informant gave false testimony and because government inducements for that testimony were not revealed to the defense and were, hence,

---

[21]Also suggesting petitioner at least *knew* of Benham's killing is his admission that, after leaving the shack early in the morning, he and Crenshaw spent the whole of the day and part of the evening in nearby Barstow, where they played video games at an arcade, rented a motel room and eventually stole another car. If, as he testified, petitioner thought Benham had merely been tied up, and would free herself eventually, it is unlikely he would have agreed to linger so long in the vicinity.

unavailable to impeach the informant at trial. As here, we concluded the informant's evidence was not substantially material or probative: it did not bear a reasonable probability of affecting the result. Our further reasoning on the petitioner's nondisclosure claim is fully applicable here and compels denial of relief on petitioner's nondisclosure claim: "Because it is not reasonably probable that [petitioner] could have obtained a different result in the absence of [the informant's] testimony in its entirety, it is not reasonably probable that he could have obtained a different result in the absence of evidence that would merely have subjected [the informant] himself to impeachment—or better, *further impeachment* [citation]. For the most that such evidence could have done would have been to render [the informant's] testimony a nullity. As a result, our confidence in the outcome is not undermined." (*In re Sassounian, supra,* 9 Cal.4th at p. 550, fn. omitted, second italics added.)

Petitioner's briefs are not clear as to whether he is also currently claiming entitlement to relief on the ground the prosecution knew the falsity of Laughlin's testimony regarding the absence of any promises.[22] Assuming petitioner does intend to make this claim, and applying a "reasonable likelihood" test of materiality equivalent to the "beyond a reasonable doubt" standard for constitutional trial error (see *In re Jackson, supra,* 3 Cal.4th at pp. 597-598), we reject the claim. The jury knew Laughlin was testifying for the prosecution in three other current cases and that his own current charges had recently been dismissed without trial, despite compelling evidence of guilt as to, at least, the escape charge. They also heard Caylor's testimony that Laughlin himself admitted he was informing against petitioner in expectation of receiving prosecutorial benefits. The additional information that Sergeant Bill Arthur had impliedly promised Laughlin unspecified "consideration" did not bear a reasonable likelihood of altering the jury's verdicts.

## IV. DISPOSITION

The judgment is modified by vacating the special circumstance findings that the murder of Myrtle Benham was perpetrated in the commission of robbery and kidnapping. In all other respects the petition for writ of habeas corpus is denied. The order to show cause is discharged.

---

[22]Petitioner did make this claim in the petition. The claim was arguably embraced by our order to show cause, which issued, inter alia, on the claim Laughlin falsely testified no promises of consideration had been made him for his testimony. A finding that law enforcement officials made implied promises to Laughlin would necessarily imply the prosecution was, or should have been, aware of such promises. (See *Kyles* v. *Whitley* (1995) 514 U.S. __, __ [131 L.Ed.2d 490, 508-509, 115 S.Ct. 1555] [prosecutor's duty to reveal exculpatory evidence extends to all favorable material information known to police].)

Lucas, C. J., Mosk, J., Kennard, J., Baxter, J., George, J., and Arabian, J.,* concurred.

Petitioner's application for a rehearing was denied May 15, 1996.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.