Filed 2/23/15  P. v. Carter CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID CARTER,<br><br>        Defendant and Appellant. | A139902<br><br>(San Francisco County<br>Super. Ct. No. SCN218768) |

David Carter appeals from a judgment sentencing him to prison after a jury convicted him of residential robbery and residential burglary in a case where his defense at trial was mistaken identity.  He contends the judgment must be reversed because one of the jurors, who worked as an emergency room physician, stated during deliberations that an injury on appellant's hand at the time of his arrest appeared to be a bite mark.  Appellant argues this comment amounted to prejudicial juror misconduct in a case where the victim testified she had bitten her assailant's hand during the robbery.  We affirm.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  *Trial Evidence*

The district attorney filed an information charging appellant with first degree residential robbery (Pen. Code, §§ 211, 212.5, subd. (a))[1] and first degree residential

---

[1]  Further statutory references are to the Penal Code unless otherwise indicated.

burglary (§§ 459, 460, subd. (a)).  In his trial before a jury, the following evidence was adduced:

At about 11:30 p.m. on July 23, 2012, Sandeep Kaur was walking home from work while talking on her iPhone using her headphones.  She was not paying attention to what was happening around her as she walked.  She arrived at her apartment building on Turk Street, in the Tenderloin area of San Francisco, and unlocked the building's front outer gate with her key while standing in the lighted doorway.  Kaur noticed a man standing about a foot behind her, and asked him whether he had a key to the inner door after turning to look at him.  She did not recall whether he answered her, but she assumed he lived in the building and she was not nervous or scared.  The man walked through the unlocked inner door ahead of Kaur as she paused to make another call.

Once inside the lobby, the man walked to the elevators, waited briefly, and then walked up the stairs.  Kaur looked at him while he was standing in the well-lit lobby by the elevator and saw a side view of his face.  She walked upstairs to her family's apartment on the second floor.  The hallway leading to the apartment was lit well enough to see people clearly.

Before Kaur could open her apartment door, the man who had followed her into the building grabbed her from behind and covered her mouth with his hand.  Kaur tried to scream but could not.  She bit down on the man's hand and tried to remove it from her mouth by pulling on it with her hand and shaking her head from side to side.[2]  They struggled for several seconds as the man tried to take Kaur's purse and phone, during which time the man's hand or elbow hit Kaur's back "really hard."  About halfway through the struggle, Kaur was able to remove the man's hand from her mouth and turned to look at his face.  The struggle ended when Kaur's phone fell to the floor and the man picked it up and ran away.  Kaur had scratches on her cheek and hand after the struggle.  She described her assailant as Black/African-American, a little shorter than she was (five feet six inches), wearing a red jacket.

_____

[2] Kaur did not remember how hard she bit the man's hand, but she did not taste or see blood as a result of the bite.

2

Kaur and her mother contacted the building manager, who called 911 and retrieved a surveillance video of the lobby area that showed Kaur and her assailant entering and the assailant fleeing the building. San Francisco Police Department Officers O'Brien and Smith were dispatched to the building shortly after midnight and obtained a description of the assailant from Kaur, which was broadcast over the radio and included the suspect's gender, race and clothing description. O'Brien then viewed the surveillance video and sent out a second broadcast with a more detailed description of the suspect, describing him as a Black male in his thirties, approximately five feet eight inches tall, wearing a distinctive red-and-white hoodie with horizontal stripes.

Two other San Francisco Police Department officers detained appellant on O'Farrell Street at 2:45 a.m., about three and a half blocks away from Kaur's apartment building, because he matched the description of Kaur's assailant and had a fresh wound on his hand. O'Brien and Smith drove to the location, where O'Brien noted appellant's clothing matched what he had seen earlier in the surveillance video. O'Brien also noted appellant had a fresh wound on his right hand, consisting of marks that were "still a pink, almost wet color with no scab on them." Appellant appeared to be slightly shorter than O'Brien, who was five feet seven inches tall.

O'Brien and Smith returned to Kaur's apartment to take her to a "cold show," a procedure by which a crime victim or witness is read a set of instructions and taken to a location to view a possible suspect and see if he or she was involved in the crime. They told Kaur they might have a suspect detained, but O'Brien testified they did not do or say anything to lead her to believe they had the right person in custody. O'Brien read Kaur a cold show admonition advising her the person she would see might or might not be the person who committed the crime, that she should not assume the person would be the one

3

who committed the crime, and that she was under no obligation to identify anyone. Kaur signed a form containing the admonition, indicating she understood it.[3]

At the cold show on O'Farrell Street, police officers shone a spotlight on appellant and Kaur "unequivocally identified" him as the person involved in the crime, stating, "Yes, that's him, believe me." Appellant was taken into custody, where he was photographed and his clothing taken as evidence. He was not carrying Kaur's iPhone when he was arrested, nor was he carrying a significant amount of cash, even though iPhones can be sold for between $50 and $500 depending on the model. Appellant was not wearing or carrying eyeglasses at the time of his arrest, and Kaur had not seen him wearing glasses.

Kaur was not able to identify appellant in court as her assailant. She was shown photographs of appellant taken on the night of the robbery and was sure the person in the photos was the one who had robbed her, though she could not say whether appellant, as he appeared in court, was the same person. She noted appellant's face was shaved and his haircut was different; the man who robbed her had facial hair. Appellant was also wearing glasses during the trial. Kaur testified she was "quite sure" of her identification of the man at the cold show as the robber, and that she identified him because the lights were clear and she could see his face, not because the officers forced her to pick someone.

The defense called Dr. Kathy Pezdek, a cognitive scientist who did research on memory, to testify on the subject of memory and eyewitness identification. Though acknowledging most eyewitness identifications were accurate, Pezdek had concerns about the accuracy of Kaur's identification of appellant due to a variety of factors, including Kaur's stress during the robbery, her testimony that she had viewed her robber's profile (which made for a less accurate identification than a full facial view), the

---

[3] According to Kaur, the cold show form was not read to her. She testified the officers who took her to the cold show said they "found the guy" and told her, " 'We [are] going to take you to see him, and if you think that's the guy, or if you [are] a little bit sure about it, then say, 'Yes, that's the guy.' " O'Brien testified he and his partner did not indicate appellant was the right person or push Kaur in one direction or the other.

cross-racial nature of the identification, the suggestive nature of the cold show procedure, and the distinctive nature of the robber's clothing, which heightened the risk of false identification based on that clothing. In Pezdek's opinion, a witness's confidence in an identification did not make it more likely to be accurate.

The defense also called emergency room physician Dr. Ryan O'Connor to testify about the injury on appellant's hand at the time of his arrest. Having reviewed the photographs of the injury, O'Connor believed it was inconsistent with a bite. He noted the three fresh marks on appellant's hand, though forming a crescent shape resembling a bite mark, were superficial in nature whereas biting usually crushes and tears the skin. On cross-examination, however, O'Connor agreed the marks could have been bite marks, that they could have been caused by scraping or scratching, and that if teeth had scraped up against the skin, they could cause marks similar to one close to appellant's knuckle. Given their fresh appearance, the marks would have been inflicted within 36 hours of the time the photographs were taken.

The jury convicted appellant of residential robbery and residential burglary as charged.

B. *Motion for New Trial Based on Juror Misconduct; Sentencing*

Before the sentencing hearing, the defense filed a motion for new trial based on juror misconduct. (§ 1181.) The motion was accompanied by a declaration signed by one of the jurors, stating: "1. I was a juror in the case of the *People v. David Carter*, Case No. 12019070, in San Francisco Superior Court. [¶] 2. I was asked about the 'bite marks' evidence and what was said in the deliberations on this point. It was discussed in deliberations. [¶] 3. In my opinion, the bite marks were not an important piece of evidence. [¶] 4. There was an older gentleman juror who was 'an ER doctor at SFGH [San Francisco General Hospital].' This doctor-juror said that 'it looked like bite marks.' I do not recall his name. [¶] 5. Though the doctor admitted that it 'wasn't his specialty,' he told us he does see bite marks in his work. [¶] 6. The doctor said that the way that wounds looked in the pictures, 'the wounds looked fresh—recent injuries.' [¶] 7. The

5

doctor pointed out on the photos that the injuries 'were pink' and 'hadn't scabbed over,' so they were 'fresh,' in his opinion." The defense argued the statements by the doctor-juror amounted to testimony by an unsworn expert witness, whom appellant was unable to confront or cross-examine.

After hearing argument from both sides, the trial court denied the motion for new trial. It sentenced appellant to prison for the four-year middle term on the residential robbery count and a concurrent four-year middle term on the residential burglary count. (§§ 213, subd. (a)(1)(B), 461, subd. (a).)

## II. DISCUSSION

Appellant contends the trial court erred in denying his motion for new trial, arguing the declaration he submitted established juror misconduct and the prosecution failed to rebut the presumption of prejudice that arose from that misconduct. We disagree.

"The trial court is vested with broad discretion to act upon a motion for new trial. [Citation.] When the motion is based upon juror misconduct, the reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but must exercise its independent judgment to determine whether any misconduct was prejudicial. [Citations.] . . . Juror misconduct raises a rebuttable presumption of prejudice; a trial court presented with competent evidence of juror misconduct must consider whether the evidence suggests a substantial likelihood that one or more jurors were biased by the misconduct. [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*).) "Although prejudice is presumed once misconduct has been established, the initial burden is on the defendant to prove the misconduct." (*In re Carpenter* (1995) 9 Cal.4th 634, 657.) The trial court has the discretion to determine whether an evidentiary hearing is necessary to resolve factual disputes raised by a claim of juror misconduct. (*Dykes*, at p. 809.)

In this case, the alleged misconduct was a doctor-juror's statement that the injury on appellant's hand on the night of his arrest resembled a bite mark and looked fresh. "It

6

is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." (*In re Malone* (1996) 12 Cal.4th 935, 963 (*Malone*).)

Appellant argues that because the juror who believed appellant's injury was a bite mark was an emergency room physician, his statement injected "external information in the form of a juror's own claim to expertise or specialized knowledge" and amounted to misconduct under *Malone*, *supra*, 12 Cal.4th at p. 963. We do not agree.

The case is akin to *People v. Steele* (2002) 27 Cal.4th 1230 (*Steele*), in which a defendant claimed he had committed the charged capital murder due to posttraumatic stress disorder and mental/behavioral abnormalities resulting from his military service in the Vietnam War. (*Id*. at pp. 1240-1242.) He alleged four jurors with experience in the military and Vietnam and two jurors with medical expertise had committed misconduct by offering their expertise to the other jurors during deliberations. (*Id*. at pp. 1259-1260.) According to two jurors who submitted declarations supporting a new trial motion, the jurors with military experience stated defendant's military records did not show the defendant served in Vietnam at a time when he might have been exposed to combat and he would not have learned to kill at a counterinsurgency school as claimed because they had attended the same schools and did not learn how to kill in them. (*Ibid*.) Additionally, two jurors with medical experience were critical of a "BEAM" (brain electrical activity mapping) test used by a defense expert to assess the defendant's mental state. (*Id*. at pp. 1241, 1260.) The Supreme Court affirmed the trial court's denial of the new trial motion. "[E]xtensive evidence was produced concerning the nature and extent of defendant's military training and Vietnam experience and its effect, if any, on his crimes, as well as evidence concerning the validity of BEAM testing. This evidence was

7

susceptible of various interpretations.  The views of the jurors allegedly asserted here were not contrary to, but came within the range of, permissible interpretations of that evidence.  All jurors, including those with relevant personal backgrounds, were entitled to consider this evidence and express opinions regarding it.  '[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors.' " (*Id*. at pp. 1265-1266.)

Similarly, in *People v. San Nicolas* (2004) 34 Cal.4th 614, 648-649 (*San Nicolas*), the defendant alleged a juror who was a registered nurse committed misconduct during deliberations by explaining a number of medical issues relating to whether the victim was dead before she was sexually assaulted (an issue germane to his convictions of rape and lewd conduct and the jury's true findings on two felony-murder special circumstances). (See *id*. at pp. 624, 630-631, 659-660.)  The Supreme Court disagreed:  "No declaration suggests [the nurse-juror] made any assertion inconsistent with the properly admitted evidence and testimony." (*Id*. at p. 650.)

The doctor-juror in this case, like the "expert" jurors in *Steele* and *San Nicolas*, did not commit misconduct.  Though the juror was an emergency room doctor and indicated he had seen bite marks before (just as a lay person might have), he did not claim any special expertise in that area.  His statement regarding the injury being "fresh" was entirely consistent with the evidence at trial.  His statement that the injury appeared to be a bite mark was a permissible interpretation of the evidence, because O'Connor, the defense expert, acknowledged on cross-examination the injury *could* be a bite mark and *could* have been caused by teeth scraping against the skin.  Nothing the doctor-juror said was inconsistent with the evidence presented at trial, and there is no indication he conveyed any outside information to the jury.

Even if we were to conclude the doctor-juror's statements crossed the "fine line" between using one's background in analyzing the evidence and injecting an opinion explicitly based on specialized information obtained from outside sources (*Steele*, *supra*, 27 Cal.4th at p. 1266), we would not reverse because the presumption of prejudice has been rebutted.

8

On this point, the case of *Malone*, *supra*, 12 Cal.4th 935 is instructive. There, the defendant in a capital murder case presented evidence he had answered truthfully during a polygraph test in which he stated his accomplice had killed one of the victims. (*Id*. at p. 942.) In a habeas corpus proceeding, he alleged misconduct by the jury foreperson, a psychologist who told the other jurors during deliberations she had read and discussed professional articles on polygraph examinations during the course of her studies and the accuracy rate for the tests (50 to 60 percent) was less than that claimed by the polygraph examiner at trial (80 to 90 percent). (*Id*. at pp. 947-948.) The foreperson also explained to the other jurors that the phrasing of a critical question to appellant during the polygraph examination was not in fact probative of his guilt because it asked him about a murder committed "in Baker[, California]," whereas the victim was actually killed some distance away in the community of Daggett. (*Id*. at p. 948.) The court concluded the juror had improperly injected "extrajudicial specialized information into the deliberations" in light of her assertion the information she provided was derived from her own professional knowledge. (*Id*. at p. 963 & fn. 16.)

The court in *Malone* then turned to the question of prejudice: "A juror's misconduct raises a presumption of prejudice, which may be rebutted by proof no prejudice actually resulted. [Citations.] 'A judgment adverse to a defendant in a criminal case must be reversed or vacated "whenever . . . the court finds a *substantial likelihood* that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury." [Citations.] . . . [¶] "The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror." ' " (*Malone*, *supra*, 12 Cal.4th at pp. 963-964.)

Applying this standard, the court concluded the prosecution had "successfully rebutted the presumption of prejudice" because the information conveyed by the juror was "substantially the same as evidence and argument presented to the jury in court."

9

(*Malone*, *supra*, 12 Cal.4th at p. 964.)  The court noted the defense polygraph examiner had conceded on cross-examination that some studies placed the accuracy of a polygraph examination at around 60 percent, and that the question regarding the defendant's commission of a murder "in Baker" rather than in Daggett where the killing actually occurred could lead to an incorrect result.  (*Id*. at pp. 964-965.)  "Because [the juror's] assertions were substantially the same as evidence and argument presented at trial, her error was much less egregious than similar misconduct we have found warranted reversal.  [Citations.]  Viewed in context of the evidence at trial, the misconduct here does not support a finding that at least one juror was improperly influenced to petitioner's detriment."  (*Id*. at p. 965.)  Similarly, the doctor-juror in this case did not go outside the trial evidence, which showed appellant's hand injury was fresh and could have been a bite mark.

In upholding the trial court's order denying the motion for new trial, we disregard the portion of the declaration in which the declarant-juror opined the bite marks were not an important piece of evidence.  A court considering a motion for new trial based on alleged jury misconduct may consider only evidence of "overt acts," including "statements made . . . either within or without the jury room."  (Evid. Code, § 1150, subd. (a).)  Evidence showing the effect of such overt acts or concerning the mental processes of the jurors is inadmissible.  (*Ibid*.; *Steele*, *supra*, 27 Cal.4th at pp. 1260-1262.)  The declarant-juror's opinion regarding the importance of certain evidence was a statement of that juror's mental process and reasoning, and was not admissible to prove or disprove misconduct or prejudice.[4]

---

[4]  Appellant argues the trial court improperly placed the burden of demonstrating prejudice on the defense, rather than the prosecution, and focused on the inadmissible aspect of the declaration stating the bite mark evidence was unimportant.  We need not determine whether the record reflects a misunderstanding of the law by the trial court, because the facts underlying the motion for new trial are not disputed and we apply an independent standard of review to the question of prejudice.  (See *People v. Callahan* (2004) 124 Cal.App.4th 198, 209 [when trial court *grants* motion for new trial based on juror misconduct, standard of review is abuse of discretion; when it *denies* such a motion,

## III.  DISPOSITION

The judgment is affirmed.

 

 

 

                                                      _____

                                                       NEEDHAM, J.

We concur.

 

_____

JONES, P. J.

 

_____

BRUINIERS, J.

---

appellate court independently reviews prejudice prong].)  Any flaws in the trial court's reasoning do not affect our independent review.