Filed 2/28/22  P. v. Froste CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C088686 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF20183504) |
| v. | |
| DAVID ASHLEY FROSTE, | |
| Defendant and Appellant. | |

A jury found defendant David Ashley Froste guilty of first and second degree murder and kidnapping.  He was sentenced to life in prison without the possibility of parole.  On appeal, defendant raises three contentions:  (1) the admission of certain hearsay statements, as a statement against interest, was error because the statements were not against the declarant's penal interest and lacked indicia of reliability; (2) the trial court abused its discretion in refusing to hold an evidentiary hearing into possible juror misconduct; and (3) punishment for kidnapping must be stayed pursuant to Penal Code

1

section 654. (Statutory section citations that follow are to the Penal Code unless otherwise identified.)

Only the third contention has merit. We will modify the judgment to stay punishment for kidnapping and otherwise affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

After defendant and his compatriots were robbed of their marijuana, defendant wanted revenge and murdered the two victims. The first victim, Enrique Rios, was 16 when he was killed, the second victim, Elijah Moore, was 17. During the first murder, defendant was aided by two accomplices. The older accomplice was 19, the younger accomplice was 16; defendant was then 25. During the second murder, defendant was aided by the original accomplices, as well as a third accomplice, defendant's brother.

After the murders, the younger accomplice told others about his involvement in the robbery and murders. At trial, many of them would testify to the young accomplice's statements. Also, at trial, defendant's brother testified to the robbery and both killings.

1. *Defendant's brother's testimony*

Defendant's brother, who was 19 at the time of the murders, testified that on October 17, 2016, defendant called him in the middle of the night. Defendant said he had been robbed at gunpoint, and three ounces of marijuana was taken. He explained that he had been contacted about selling marijuana, and he and the older accomplice had walked with the buyer (the second victim) to a car. The buyer got into the backseat, pointed a gun at defendant, and told him to give him everything he had.

Defendant told his brother he was going to try to find the robber and shoot up his house. Defendant and the brother agreed to meet, but first, defendant would go to Knights Landing to get his gun.

Later that night, defendant and the two accomplices met the brother. Both accomplices were friends of defendant and his brother. Defendant was "very angry" and

2

said he wanted blood. The accomplices were also angry about being held up at gun point. The older accomplice said, if they couldn't find the second victim, they would get his friend, the first victim.

The others asked the brother if he wanted to come, but the brother said he wanted no part of it.

2. *The first murder*

The next morning, the brother again talked to defendant, who told him that he had shot and killed the first victim. Defendant said that he and the accomplices had driven to Esparto to pick up the first victim and then drove toward Knights Landing. Defendant had had the older accomplice, who knew the first victim, text him that there was a party in Knights Landing.

Outside of Knights Landing, they stopped alongside a river, and defendant got out of the car, saying he needed to "take a piss." He then asked the older accomplice to come outside and asked if he was sure they should do this. The older accomplice said yes.

Defendant took the gun from the trunk and told the first victim to get out of the car. When the victim refused, defendant shot into the air. The victim got out, and his assailants tried to get him to text the second victim to meet up. He refused. Defendant told him he was going to die because of the second victim. When he told the victim to pray, the victim started running. Defendant shot at him, emptying the clip.

Defendant told his brother he had shot the first victim a couple of times, in the lower part of the body. When he could still hear the victim moaning, he shot him in the head.

Defendant then undressed because he had blood on him and did not want it to touch the car interior. Defendant then had the older accomplice drive him to Knights Landing to borrow a friend's truck to pick up the body. Defendant told the truck owner

3

that his car was stuck, and he needed to pull it out. Using the truck, they moved the body and buried it.

The brother testified that some weeks later, defendant told him that he had asked the truck owner if he could wash the truck. Defendant and the owner took the truck to a car wash, sprayed it down, and defendant used bleach in the back to cover up the blood.

The day after the first murder, the brother drove to Woodland and talked to the older accomplice. The older accomplice was very shocked having watched the first victim die. The accomplice said he had gone with defendant to pick up the first victim, and they went to Knights Landing, where defendant shot the victim.

The older accomplice also said that he had the first victim's phone. He said he was going to contact the victim's mom with it and say he was going to run away. He had also used the phone to contact the second victim, asking if he wanted to meet up. The second victim did not.

3.       *The second murder*

On November 4, 2016, the brother was with defendant and the younger accomplice, eating food in front of a liquor store and a smoke shop at Purity Plaza. There, they saw the second victim walk into a barber shop. Defendant waited until the second victim came out, then confronted him. The brother heard the victim apologize for the robbery. Defendant told him to get into the trunk if he wanted to take the punishment for the robbery. Defendant said he'd be driven somewhere far away and made to walk home. The victim agreed and got in the trunk.

But first defendant made him take off his shoes and took $300 from him (the victim had just cashed a paycheck). Defendant then told his brother to turn off his cell phone so it wouldn't be tracked. They all turned off their phones.

4

They first drove to the older accomplice's home. Along the way, defendant said he was going to kill the victim. When the older accomplice wasn't home, they called him. He arrived shortly after.

Defendant told the older accomplice the victim was in the trunk and asked for the gun he was holding for him. After the older accomplice retrieved the gun, they all drove to "a remote area" outside of Knights Landing. The brother described it, at trial, as "out in the middle of nowhere," and "an isolated area," with "trees around." He also said there was "a wall . . . like a levee," and "if you drove behind the levee, no one could see you from the street, from the road."

There, defendant told the brother to open the trunk, and handed the gun to the older accomplice to point at the victim. The victim looked shocked to see a gun pointed at him. Defendant told him to get on his stomach, and he zip tied his hands behind his back. Telling him he should not have robbed him, defendant lifted the victim and told him to start walking. They all walked about a quarter mile to the area where defendant had buried the first victim. In his testimony, the brother described there being a "wall of trees" and a "clear path" next to the levee.

There, defendant pushed the victim down and told him he would be buried next to the first victim. The victim asked if he could call his mother and was told no. Defendant made the victim get on his stomach and zip tied his ankles. He told the victim to pray before he came back.

Defendant and the younger accomplice then drove off to get supplies: gasoline, bleach, garbage bags, and digging tools. Before he left, defendant gave the older accomplice the gun and told him not to let the victim go. He also said he wanted him alive so he could kill him.

At one point, while defendant was gone, the brother held the gun. When asked, at trial, why he didn't let the victim go, he testified, "I was afraid of what [defendant] would do to me if I let [the victim] go."

5

The brother estimated that defendant had been gone for an hour; it had gone from day to night. While he was gone, the victim asked the brother and the older accomplice to pray with him, and they did.

When defendant and the younger accomplice returned, defendant told the victim, "I'm sorry your prayers couldn't save you." He then picked up a tree branch the size of a baseball bat, and hit the victim in the back of the head with it. He told the others to hit him in the head too. They all hit the victim in the head with the branch.

The victim was hit five or six times, though after the first hit, he went limp and did not react. Defendant then found the biggest log he could lift and dropped it on the victim's head, crushing his skull. The brother testified the log was so big, defendant couldn't wrap one arm around it, and had to use two arms to lift it by its sides.

Even though the victim's skull was open, defendant shot the victim in the head to make sure he was dead.

Defendant said he needed to start digging a hole. They took turns digging a grave. Defendant said not to dig too close to where the first victim had been buried.

Defendant then removed the zip ties, dragged the body into the hole, threw bleach and gasoline on the body, and set it ablaze. They then buried the remains.

Defendant told the others to undress and put their clothes in a garbage bag so as not to touch the car interior. They put the tools and shovel into a separate garbage bag. The brother then drove the others away.

On the way, defendant told him to pull over, and they threw the clothes on the side of a field. Defendant threw gasoline on the pile and lit it on fire. They then threw the tools over a bridge into the water.

From there, they went to the brother's house to get new clothes. Afterwards, they drove to Woodland and ate. Defendant paid using money taken from the second victim. They had also kept the second victim's phone, which they used to contact the victim's friend, telling him the second victim was out in the Bay Area.

After defendant was arrested, the brother would visit him in jail. During those meetings, defendant wrote notes on paper to the brother so as not to be recorded. The notes directed the brother to tell the accomplices to keep their mouths shut and get lawyers. One of those notes, discovered in defendant's jail cell, was shown to the jury.

Later, after the brother was arrested, he tried to help police locate the victims' bodies. Explaining the difficulty in finding the location, he testified at trial: "The area that we went out to is so vast and vague to get so precise of an area."

Afterwards, the brother sent defendant a "kite" (a note) saying: "We are both fucked now because I tried to find [the bodies] and couldn't. So if you love me, then you will go to your lawyer and offer them the bodies for Jonathan [the brother] to get a 15 to life and keep death penalty off the table." A copy of the note was also shown to the jury.

By the time of trial, neither victim's body had been found.

The brother ultimately pleaded to second degree murder, with the agreement that he would receive a 15-year-to-life sentence, and the People would not oppose parole in 15 years if he served his time with good behavior.

4.      *Testimony of the victims' friends, family, and acquaintances*

Friends, family, and acquaintances of the victims testified to the robbery and its aftermath. A friend of the second victim testified that the second victim told her that he had robbed one or more of defendant, the older accomplice, and the brother.

The best friend of the second victim similarly testified that the second victim told him he had robbed the older accomplice with a pellet gun. He also showed the best friend a jar with three ounces of marijuana.

The next day, the best friend got a text message from the first victim offering cocaine for sale. He testified that he did not know the first victim well enough that he would expect to get such an offer from him.

7

Three or four days after the second victim went missing, the best friend got a text message from the second victim's phone saying: "I'm out in the Bay. I'm trying to tax this bitch at her house." The friend testified that the message seemed odd, and "[h]e wouldn't say it like that to me."

The mother of the first victim similarly testified that on the morning the first victim disappeared, she received text messages from his phone, "but they were not from my son." She explained the wording was not his, everything was misspelled, and "[t]here was just some stuff that wasn't the way he wrote at all." The texts said that he wanted to be a free man and had probation breathing down his neck.

An acquaintance of the first victim, testified that he last saw the first victim in Esparto, after dark. He saw the first victim get into the passenger seat of a late 1990's, green Honda Civic and drive away. Five to ten minutes later, the car retuned, and the victim rolled down the window and said, "I'm going to go to a party."

Finally, the second victim's older brother testified that the second victim (who owned a pellet gun) came home with a jar of marijuana and said that he had robbed the older accomplice.

The older brother also testified that on the day he last saw the second victim, he was supposed to meet him in the area of Main Street by the smoke shop. While he waited, defendant came up to him, handed him a business card, and offered to sell him marijuana. Defendant was with two others, including the younger accomplice.

Later when the older brother asked defendant if he had seen the second victim, defendant said he hadn't seen him in months.

After his arrest, defendant spoke with a detective and repeatedly denied knowing the victims or having been robbed: "Never met them. That's not gonna change," and, "I just told you that I've never been robbed."

8

5. *Testimony regarding the truck defendant borrowed*

As to the truck defendant borrowed, the truck's owner testified reluctantly: "I let him borrow my car. Gave him keys. That's it. That's the story." He added, "I gave my statement three or four times and I'm obligated to be here. It's like I feel like I'm being violated."

On further questioning, the owner testified that he had known defendant since he was a kid, and in October of 2016, defendant borrowed his truck, around 3:00 in the morning, claiming his car was stuck. Defendant returned the truck about seven hours later.

The owner testified that a week or two later, he and defendant saw each other in the front yard, and defendant asked what he wanted to do, and suggested they go fishing. The owner testified that because he didn't have a fishing license, he suggested they wash his truck.

With defendant driving (the owner testified defendant drove so he could drink a beer) they went to a car wash in Woodland, where they washed the truck. At some point, the owner stepped away to take a call from his sister. At trial, he denied seeing defendant use bleach on his truck, though he testified: "I was drinking, doing whatever I was doing, didn't pay attention how he washed it or what particular things he did." Asked if he had told anyone that he saw defendant using bleach he testified, "not that I know of. Supposedly I did, I don't recall that."

The owner also denied having a conversation with his brother regarding defendant talking about hiding bodies or seeing defendant wash the truck with bleach.

The brother of the owner testified that the owner told him that he had driven with defendant to the car wash. The owner said it was defendant's idea to go to the car wash, and he was a bit taken back by the offer because the truck didn't look too bad. The owner also said it really stood out that, while taking a call from his sister, he turned

9

around and saw defendant pouring bleach in the back of the truck bed. The truck owner also said that there was a conversation were defendant mentioned getting rid of a body.

We note that the younger accomplice also gave an account of the crimes to a jail informant as well as another friend. Those statements are challenged on appeal and are discussed in part I of the Discussion, *post*.

6. *The younger accomplice's statements to witnesses*

Multiple witnesses testified that the younger accomplice told them about the robbery and the murders. One friend of the younger accomplice testified that the accomplice told him he had been robbed of marijuana. The accomplice showed him a picture of the robber on his phone. It was the second victim.

Later, when the friend was at the younger accomplice's house, along with another friend, the accomplice asked if they wanted to know a secret. He went on to say that he and some others hit the second victim with a stick, to the point where they could see brains, and that they shot the first victim. He also said that they lured the first victim by telling him they were going to a party.

The other friend there that day testified to hearing that the two accomplices and two others had been robbed of marijuana by the second victim. One of them shot the second victim.

The other friend also testified that a week later, the younger accomplice told them about the first victim. He said he had lured him to a party, before taking him "[s]omewhere out to like a river." The younger accomplice said that after the victim was shot the first time, he crawled back, said something, and was shot again.

The younger accomplice's half-brother testified that he was told that the younger accomplice and his friends were robbed when selling marijuana. The younger accomplice said that they went to find the people who stole from them, and that they shot the person who robbed them.

10

7. *Cell phone location evidence*

The prosecution offered evidence of cell phone location data from the day of the first murder, showing that around 8:30 p.m., the phones of defendant and the accomplices were all in the area of the marijuana robbery. Around 10:30 p.m., all three devices were in Esparto near the last known location of the first victim.

Within a short period of time, location data of all three phones turned off. The younger accomplice's at 10:40 p.m., the older accomplice's at 10:52 p.m., and defendant's at 10:54 p.m.

Cell phone records for that day also showed that the first victim's phone was in the area of Esparto just before 8:00 p.m., and defendant's brother's phone received two incoming calls from defendant's phone around 9:30 that night.

On November 4th, just before the second murder, defendant's and his brother's phones were in the general vicinity of Purity Plaza between 4:00 and 5:00 p.m. Defendant's phone stopped providing location data at 4:53 p.m., and his brother's phone stopped at 4:47 p.m. Data for the younger accomplice's phone was last received at 2:04 p.m. that day, and there was no location data for the older accomplice's phone.

8. *Defendant's statements to his ex-girlfriend*

Defendant's ex-girlfriend testified that defendant had been in contact with her on December 17, 2016. She testified that he told her he was stressed out and wanted to meet. When they met, he was very anxious. He said he had done something. When she asked what it was, he said she would find out about it soon. He also twice asked her if he could trust her.

*Jury Verdict and Sentencing*

The jury found defendant guilty of second degree murder of the first victim (§ 187, subd. (a); count 1). For the second victim, the jury found defendant guilty of the murder (§ 187, subd. (a); count 3) and that the murder was deliberate, willful, and

11

premediated. It also found the murder was committed during the commission or attempted commission of a kidnapping. (§ 190.2, subd. (a)(17).) But it found a firearm enhancement not true. The jury found defendant guilty of kidnapping the second victim (§ 207, subd. (a); count 4). Finally, it found a multiple murder special circumstance (§ 190.2, subd. (a)(3)) true.

Defendant was sentenced to life without the possibility of parole for first degree murder, 15 years-to-life for second degree murder, and the eight-year upper term for kidnapping.

DISCUSSION

I

*Admission of Hearsay Statements*

On appeal, defendant first contends the trial court erred in admitting the younger accomplice's statements to a friend and to a jailhouse informant. He suggests the statements were not against the younger accomplice's penal interest and were unreliable.

A. *Additional background*

Before trial, the prosecution moved to admit out of court statements made by the younger accomplice, including those made to a friend and to an undercover jail informant. The defense opposed the motion, arguing the statements were not actually against the declarant's penal interest.

The trial court admitted the statements to the jail informant. It noted the younger accomplice was unavailable as a witness. It also concluded that many of the statements were against the younger accomplice's penal interests, adding, "I do find it sufficiently reliable." It went on to note: "There are some statements in here that are self-serving and tend to try to throw the brunt of what happened against others. But it's still against penal interests. Even though it may be viewed as self-serving to some extent."

As to the statements to the friend, the trial court explained it could not rule on the objection because a transcript of the statement was not available. Later when the friend was called to testify, defense counsel only complained of late discovery and did not challenge the statements as not disserving.

1.     *The younger accomplice's statements to his friend*

A friend of both victims, who was also close with the younger accomplice and who hung out with defendant and the other accomplice, testified that two days after the second victim disappeared, the younger accomplice told him he had done something bad. He explained that the second victim had robbed him and the older accomplice at gun point. Two weeks later, they along with defendant saw the second victim walking down the street. Defendant ordered him into the trunk at gunpoint.

They took the victim to "the cuts" and were there for about five hours. The young accomplice said they made the victim "suffer." He said someone had stomped his face and they shot and killed him. He also said they chopped up the victim's body and buried him. As for the gun, he said it was defendant's, and afterwards, they got rid of the evidence, including the gun.

After that conversation, the younger accomplice sought to ensure the friend had kept his word not to tell. He told the friend if he opened his mouth, he would tell him "to meet me at the laundry mat," which the friend took as a threat.

The jury was shown a text exchange, wherein the friend expressed concerns for his safety after the younger accomplice told him people were saying he had talked. He wrote in the text exchange: "I was told that im going to be murdered and to meet someone somewhere at 9 o'clock for something that was told to me that i wasn't supposed to open my mouth about and it was fucking with my mind to much and i opened my mouth now im going to be murdered . . . ."

### 2. *The younger accomplice's statements to a jail informant*

The jury also heard a recording of the younger accomplice's conversation with a jail informant. During the talk, the informant repeatedly asked the younger accomplice about the crimes, while providing advice.

The younger accomplice spoke of the robbery, admitting they had been robbed of "Money and tree." As to the second murder, he said the older accomplice, the brother, and defendant were there with him. He admitted picking up the victim: "We made him get in the trunk. [¶] . . . We told him we're just gonna leave him in the Cuts."

He described the second victim's death, including that he was hit with an oak branch and that "you can see the skull." He specifically said that the brother hit the victim in the head with the branch and that defendant shot the victim: "He blasted him."

As to the aftermath, the younger accomplice said he burned the bodies and buried them in the ground. He also burned his clothes. And as to the gun, he said, "My friend [defendant] said he gave it to someone, we sold it."

He also said it was defendant's idea to burn the body. And when asked, "Whose idea was it to do all that shit—take the fools out?" he answered defendant. He also, said: "To be honest, I didn't do shit. I just helped."

At a couple of points in the discussion, the younger accomplice expressed his dismay at the situation. When a detective told him they had just picked up the older accomplice, the younger accomplice said "Oh, shit. . . . [¶] . . . Fuck. . . . [¶] . . . It's just—fuck, man. Everything is just fuckin' falling apart, man." "[W]e're not getting out for sure. Fuck. I knew this was gonna happen one day."

And when asked if he regretted it, he said, "Part of me does, but part of me doesn't," explaining, "[w]e did what had to be done. . . ."

B.    *Defendant's contentions regarding hearsay*

Defendant challenges the admission of these statements on appeal. As to the statements to the friend, defendant argues they reveal a desire to shift the blame to defendant. He notes the younger accomplice said it was defendant who forced the second victim into the trunk. He also said it was defendant's gun that had to be disposed of after the crime. Defendant maintains these statements were self-serving and therefore could not qualify as statements against penal interest.

As to the statements to the jail informant, defendant notes the younger accomplice said defendant ordered the second victim into the trunk, controlled and disposed of the gun, and shot the victim. He also said that the brother hit the victim with a branch. Further, it was defendant's idea to "do all that shit." Defendant maintains that the younger accomplice appeared to assert that he merely helped to burn and bury the bodies.

Defendant also notes that when the younger accomplice made the statement to jailhouse informant, he had just been arrested and been told of police efforts to determine his level of complicity. Thus, he was under pressure to spin the facts to diminish his own involvement. He also argues it would not have been difficult to excise statements incriminating defendant from the remainder of the self-disserving statements.

The People respond that the statements were properly admitted as statements against interest.

The People also maintain defendant's challenge to statements to the friend is forfeited. (*In re Seaton* (2004) 34 Cal.4th 193, 198 ["as a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal' "]; Evid. Code, § 353.) The People reason that while trial counsel initially objected, counsel failed to press for a ruling after the trial court deferred its ruling. Assuming the People are correct, defendant has also raised this

15

challenge as a claim of ineffective assistance of counsel. We therefore consider the merits.

C.  *Applicable law*

Evidence Code section 1230 permits the introduction of hearsay evidence, where the declarant is unavailable, and where his statements are against his interests. The rationale for this exception " 'is that "a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest," thereby mitigating the dangers usually associated with the admission of out-of-court statements.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 47 (*Chhoun*).)

Accordingly, to satisfy the exception, a proponent must show (1) the declarant is unavailable; (2) the statement was against the declarant's penal (or other) interest; and (3) the statements were sufficiently reliable to warrant admission. (*Chhoun*, *supra*, 11 Cal.5th at p. 47.) In determining whether the exception is satisfied, the trial court may consider not only the words, but the circumstances they were uttered under, the declarant's possible motivation, and "the declarant's relationship to the defendant." (*Id.* at p. 48.) Thus, even if a statement runs against the declarant's penal interest, it may still lack sufficient indicia of trustworthiness, in light of the circumstances. (*Ibid.*)

On appeal, we review the trial court's ruling admitting such evidence for abuse of discretion. (*Chhoun*, *supra*, 11 Cal.5th at p. 26.) We will not disturb the trial court's decision, unless the exercise of discretion is shown to be " ' " 'arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid.*)

D.  *Analysis*

Here, the trial court acted within its discretion in admitting the statements. There is no challenge to the finding that the declarant was unavailable, and the record supports the finding that the statements were against penal interest and sufficiently reliable.

16

Simply because a statement identifies another as the ringleader, or suggests another is more culpable, does not mean the statement is not against the declarant's penal interest. Indeed, such statements can be evidence of a declarant's involvement in a conspiracy. (See *People v. Samuels* (2005) 36 Cal.4th 96, 120-121 [admission that defendant paid declarant for the killing disserved declarant's interests in that it intimated he had participated in a contract killing and a conspiracy to commit murder]; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 337 [declarant's statement about having been with defendant on a homicide and been paid for driving the car was disserving of declarant's penal interest].) And here, the challenged statements all pertained to the declarant's involvement in the murders and were properly found to be statements against penal interest. (See also, *People v. Grimes* (2016) 1 Cal.5th 698, 715 ["we have permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest' "].)

Still, statements foisting blame onto others can be fairly challenged as insufficiently reliable. And along those lines, defendant argues his case is analogous to *People v. Duarte* (2000) 24 Cal.4th 603, 614 (*Duarte*), where our Supreme Court held the admission of a codefendant's hearsay statement was error as the statements were not specifically disserving. (*Id*. at p. 613.)

There, the victim was shot in her thigh with an assault rifle bullet, when a barrage of bullets hit her house. (*Duarte*, *supra*, 24 Cal.4th at pp. 607-608.) Police later found guns and ammunition in the defendant's apartment, though none matched those used in the shooting. (*Id*. at p. 608.) Police also searched the declarant's home and found an assault rifle, ammunition, and casings matching those found outside the victim's home. (*Ibid*.) The declarant spoke to officers, incriminating himself and defendant. (*Ibid*.) He said he had participated in the drive-by shooting with defendant, in retaliation for an earlier shooting. (*Id*. at pp. 608, 611.) But he said he had shot at the wrong house, he had

17

used a gun other than the one found at his home, and he had not wanted to hurt anyone and so he aimed at the roof. (*Id*. at pp. 612-613.)

The court concluded those portions of the declarant's statement were not specifically disserving, noting they tended to sympathetically describe the declarant's participation, minimizing his responsibility for the victim's injuries, and implying others bore a greater share. (*Duarte*, *supra*, 24 Cal.4th at p. 613.) Elsewhere, the court noted the declarant had never confirmed his own culpability without alluding to the culpability of others or to circumstances that might elicit sympathy. (*Id*. at pp. 615-616.) It also noted that officers had suggested that his cooperation could avoid him spending the rest of his life in jail. (*Id*. at p. 617.) The declarant also knew police had physical evidence linking him to the crime, and thus he may have believed he had little to lose, and perhaps something to gain, by admitting his role while shifting responsibility to others. (*Ibid*.)

Here, defendant maintains that like the declarant in *Duarte*, the challenged statements admitted the younger accomplice's involvements, but shifted the major blame to defendant and thus did not constitute statements against interest, nor were they sufficiently reliable. We, however, see stark differences.

The context in *Duarte* strongly indicated the declarant's motives were purely self-serving, and his statements unreliable. Here the context suggests the opposite. (See *People v. Grimes, supra,* 1 Cal.5th at p. 716 [" '[W]hether a statement is self-inculpatory or not can only be determined by viewing the statement in context' "] quoting *People v. Lawley* (2002) 27 Cal.4th 102, 153.) The younger accomplice told numerous people of his involvement. And while some of his retellings included more details, they were not inherently contradictory. (*Cf. People v. Smith* (2017) 10 Cal.App.5th 297, 304 ["Inconsistent statements by a declarant raise obvious questions about the credibility of a subsequent contrary assertion, and inconsistent statements are 'obvious indicators' of unreliability"].) Further, his statements identifying defendant as the gun owner, shooter, and ringleader were consistent with other evidence and testimony provided—unlike the

18

statements in *Duarte* which were inconsistent with the firearm evidence found in the declarant's home.

And unlike the declarant in *Duarte,* who knew he was speaking to police, every indication suggests the young accomplice had no idea he was speaking to an informant (or a friend who would later testify). Indeed, given the number of people he spoke to, his primary motivation appeared to be the need to get his crimes off his chest. (*Chhoun, supra,* 11 Cal.5th at p. 48 [" ' "The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception" ' "].)

The record amply supports the trial court's finding that the statements were admissible under the hearsay exception set forth in Evidence Code section 1230.

II

*Refusal to Order Evidentiary Hearing*

Defendant next contends the trial court erred in refusing to order an evidentiary hearing after a post-verdict press interview disclosed likely juror misconduct. We find no error.

A.     *Additional background*

Following the verdict, the defense moved for a new trial. Its motion explained that the jury foreperson was interviewed for an article in the Davis Enterprise and was quoted and paraphrased throughout the article. Based on that article, the defense asserted three claims of juror misconduct: (1) a juror who was fluent in Spanish provided assistance where the recording of the younger accomplice's statements to the jail informant fluctuated between English and Spanish; (2) a juror familiar with the Knights Landing area attested to driving times and the existence of isolated hideaways; and (3) a juror who

19

was a doctor opined that had the second victim not been shot, he still could not have survived the preceding injuries.

The defense argued that since the jurors had obtained evidence from out of court sources, and those sources were prejudicial to the defendant, grounds for new trial existed. Alternatively, the defense asked the court to call the jurors to testify at a hearing to determine if the quoted statements were true, and if misconduct occurred.

The trial court denied the new trial motion, finding insufficient grounds to support it. It added that defendant had received a fair trial, the evidence of guilt was beyond a reasonable doubt, and, "I do not find juror misconduct."

B.    *Analysis*

"A juror's receipt or discussion of evidence not submitted at trial constitutes misconduct." (*People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*).)

For its part, "[t]he trial court has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct." (*Dykes, supra,* 46 Cal.4th at p. 809.) But a trial court need not hold a hearing in every instance of alleged jury misconduct, nor should such hearings be used as a " 'fishing expedition' " for possible misconduct. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.) Rather, a hearing should be held "only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." (*Ibid.*)

For our part, we will only reverse the trial court's decision regarding an evidentiary hearing on juror misconduct where we find an abuse of discretion. (*Dykes, supra,* 46 Cal.4th at p. 810.) Ordinarily such discretion is not abused when the evidence in support of the hearing is hearsay. (*Ibid.*)

1.    *The first claim*

As to the first claim, defendant argues the article shows the jurors had disregarded the trial court's instruction to rely on the court's translation and instead relied on their

20

own translation. To that, the trial court had told the jury that a transcript is not evidence, but for the jail informant recording, it carved out an exception: "You remember we had an audio that we listened to that had Spanish words in it, and you were provided a transcript which had the Spanish translation into English. I'm going to modify slightly my instruction to you that transcripts are not evidence. They are not evidence. However, I'll carve out an exception for the Spanish translation to English. You may consider the English words of that Spanish translation. In other words, it means nothing because you heard it in Spanish. If you do need to have a readback later while you're deliberating, the court reporter can read to you the English words of the translation, but otherwise you may consider the translation as evidence in this case."[1]

According to the Enterprise article, the juror who spoke Spanish, "proved useful" when reviewing the jail recording that fluctuated between English and Spanish. Defendant maintains that this was "likely" prejudicial in that some of the Spanish portions referenced defendant's participation in the killings and corroborated the brother's testimony. He specifically points to the accomplice's statement that "David" (defendant's first name) was one of the participants in the killings, that two participants were brothers, that one victim was hit in the head before he was shot, that the bodies were burned, that the killings took place in Knights Landing, and that the participant with a gun said that he sold it after the killings. Defendant argues the juror's retranslation of the younger accomplice's comments "may well have improperly bolstered the probative value of [his] remarks," and was therefore likely prejudicial.

While it is misconduct for a juror to inject expertise into the jury's deliberation, including retranslating foreign-language evidence, there is no indication the juror did so here. (See *People v. Cabrera* (1991) 230 Cal.App.3d 300, 303 (*Cabrera*).) In this way,

---

[1] Only the recording of the young accomplice's jail statement was admitted into evidence, not the transcript.

21

this case is distinguishable from *Cabrera*, where a Spanish-speaking juror disagreed with some of the court-provided translation of the defendant's testimony spoken in Spanish: the juror claimed defendant said he " 'pushed' " rather than " 'touched' " the victim, when trying to get her to do her chores. (*Id*. at p. 302.) Here, however, nothing indicates the juror had any disagreement with any of the court-provided translation. Instead, defendant merely speculates that the juror's translation somehow bolstered the jail statements. This is insufficient.

Based on the first claim, a hearing would be little more than a fishing expedition, and there is no showing of an abuse of discretion in refusing one.

### 2. *The second claim*

As to the second claim, defendant argues the article shows misconduct in that jurors relied on one juror's familiarity with the Knights Landing area. Defendant maintains prejudice was highly likely insofar as jurors may have doubted the plausibility of the brother's account of the killings. Specifically, how the first victim could have been killed, unseen, on the side of the road, and how the second victim could have been tied up and forced to walk to the burial site, again unseen from the road. Defendant avers the juror's knowledge of isolated hideaways in Knights Landing may have corroborated the brother's testimony. He analogizes his case to, *People v. Sutter* (1982) 134 Cal.App.3d 806, 819-820, where misconduct was found when a juror visited a crime scene and discussed it with other jurors. Defendant argues that here too, evidence not received at trial was injected into deliberations. We again find no error.

For one, a juror being familiar with the Knights Landing area is not the equivalent of a juror visiting the crime scene for research. Indeed, "[a] juror's application of his or her everyday life experience to the evaluation of evidence is not misconduct." (*People v. Linton* (2013) 56 Cal.4th 1146, 1195.) For another, the existence of isolated hideaways around Knights Landing was shown by evidence presented at trial. (*In re Malone* (1996)

22

12 Cal.4th 935, 964 [juror misconduct harmless where "externally derived information was substantially the same as evidence and argument presented to the jury in court"].) The brother testified that during the second murder, they drove to a "remote" and "isolated area outside of Knights Landing," that was "out in the middle of nowhere . . . ." He also said that from behind the levee, no one could see you from the road. Finally, given the overwhelming evidence—both of guilt and corroborating the brother's testimony—the suggestion that the outcome might have turned on the plausibility of the crimes going unseen from the road is highly speculative.

In sum, there was no abuse of discretion in refusing to hold the evidentiary hearing based on this claim.

### 3. *The third claim*

Finally, as to the third claim, according to the article, the "expertise" of a juror who was a doctor "came into play as jurors debated [a firearm] enhancement" pertaining to the second murder. The juror doctor "opined that if the [second victim] hadn't been shot, but was still alive after the beating and received immediate medical attention, 'they could not have saved him,' [the foreperson] said. 'He was gone by that point.' [¶] Because of that, the jury found the firearm enhancement not true, [the foreperson] said."

Defendant argues the juror doctor's expertise was relied upon by the jury and was therefore misconduct. In support, defendant cites *In re Malone, supra,* 12 Cal.4th at page 963, wherein a juror with a psychology degree engaged in misconduct by citing her expertise as grounds for concluding the defendant's polygraph evidence was unreliable. Defendant argues that here the juror similarly asserted information drawn from professional knowledge. Defendant acknowledges this appears to have benefited him, leading the jury to reject the firearm enhancement. Still, he maintains it suggests jurors had disregarded the court's instruction, and therefore gave rise to the need to conduct further inquiry.

23

As defendant acknowledges, no prejudice was suffered from this asserted misconduct. (*People v. Hedgecock, supra,* 51 Cal.3d at p. 419 [a hearing should be held "only when the defense has come forward with evidence demonstrating a strong possibility that *prejudicial* misconduct has occurred," italics added].) More fundamentally, "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work." (*In re Malone*, *supra*, 12 Cal.4th at p. 963.)

And, here, there was evidence that the second victim was hit five or six times in the head with the branch the size of a baseball bat. After the first hit, he went limp and did not react. Then a log—so large defendant couldn't wrap one arm around it—was dropped on the victim's head, cracking his skull, and exposing brain. A juror of any background could properly express an opinion from this evidence that the victim could not have survived those injuries, even with immediate medical care.

Accordingly, nothing in the third claim compels the conclusion that the trial court abused its discretion in refusing to hold an evidentiary hearing.

III

*Section 654*

Finally, defendant contends punishment for his kidnapping conviction must be stayed under section 654. He reasons that kidnapping is a continuous offense that inherently involves a course of conduct. And here, the events resulting in the kidnapping and murder of the second victim, as well as the kidnap–murder special circumstances finding, constitute a single course of conduct with a single objective.

24

The People agree, noting defendant kidnapped the second victim with intent to kill, and the kidnap–murder special circumstance was based entirely on the course of conduct that proved the kidnapping in count 4.  We, too, agree.

Though a person may be convicted of more than one crime for the same act, section 654 proscribes multiple punishments for the same act.  (§§ 654, 954; *People v. Correa* (2012) 54 Cal.4th 331, 337.)  An " 'act' " can include a " ' "course of conduct." ' "  (*Correa,* at p. 335.)  But a course of conduct causing multiple offenses is divisible—and subject to separate punishment—if the defendant entertained multiple objectives, independent of and not merely incidental to each other.  (*Id.* at pp. 335-336; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1134.)

Here, as the parties agree, there is no evidence defendant harbored separate objectives for the count 4 kidnapping and count 3 murder of the second victim.  Section 654 accordingly bars punishment for both acts.  We will therefore modify the judgment to stay punishment for the count 4 kidnapping.

DISPOSITION

The judgment is modified to stay punishment for count 4, kidnapping.  The trial court is directed to prepare an amended abstract of judgment reflecting that change and to

forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


 

        _____

        HULL, Acting P. J.

We concur:


_____

HOCH, J.


_____

KRAUSE, J.